OSG BULK SHIPS, INC., et al., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

Civil Action No. 94–0006.

United States District Court, District of Columbia.

March 22, 1996.

Allan Abbot Tuttle, Patton & Boggs, LLP, Washington, DC, for Plaintiff.

Michael Joseph Ryan, Douglas A. Wickham, Cynthia Schnedar, Assistant U.S. Attorneys, Washington, DC, for U.S., Federico Pena, and Albert Herberger.

Am Loeserman Klein, Bagileo, Silverberg & Goldman, Washington, DC, for Intervenor/Defendant Puerto Rico Maritime Shipping Authority.

E. Alex Blanton, Dyer, Ellis, Joseph & Mills, Washington, DC, for Intervenor/Defendants BP Oil Shipping Company, USA, Aquarius Marine Company and Atlas Marine Company.

Anne Ellison Mickey, Sher & Blackwell, Washington, DC, for Intervenor/Defendants Margate Shipping Company and Chestnut Shipping Company.

Allan Abbot Tuttle, Patton & Boggs, LLP, Washington, DC, for Intervenor/Plaintiffs Attransco, Inc. and Matson Navigation Company, Inc.

John M. Nannes, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, for Intervenor/Defendant Sea–Land Service, Inc.

Robert Treinis Basseches, Shea & Gardner, Washington, DC, for Intervenor/Defendant American President Lines, Ltd.

Theodore S.L. Perlman, Fort & Schlefer, Washington, DC, for Intervenor/Defendant Mormac Marine.

## OPINION

PAUL L. FRIEDMAN, District Judge.

OSG Bulk Ships, Inc. sued the United States, the Secretary of Transportation and the Administrator of the Maritime Administration ("MarAd"), seeking declaratory and injunctive relief with respect to the defendants' interpretation of Section 506 of the Merchant Marine Act of 1936, 46 U.S.C. app. § 1156. Attransco, Inc. and Matson Navigation Company, Inc. were granted leave to intervene as plaintiffs.[1] Thereafter, American President Lines, Ltd., Puerto Rico Maritime Shipping Authority, Sea–Land Service, Inc., Margate Shipping Company, Chestnut Shipping Company, Mormac Marine Transport, Inc., BP Oil Shipping Company, USA, Aquarius Marine Company, and Atlas Marine Company sought and were granted leave to intervene as defendants.[2]

The case is before the Court on the cross-motions for summary judgment of OSG Bulk Ships and of the United States (supported by the separate motions and briefs of the defendant-intervenors). The Court concludes that there are no genuine disputes of material fact and that the defendants are entitled to judgment as a matter of law.

## I. BACKGROUND

### A. The Merchant Marine Act Of 1936

Congress enacted the Merchant Marine Act of 1936 to "foster the development and encourage the maintenance" of a merchant marine with U.S.-flag ships and American sailors in order to provide for the national defense and the commercial welfare of the United States. See 46 U.S.C. app. § 1101. The Act was necessary because constructing ships in American shipyards and manning them with American crews was, and continues to be, more expensive than constructing ships in foreign shipyards and staffing them with foreign crews. See Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 574–75, 100 S.Ct. 800, 802–03, 63 L.Ed.2d 36 (1980). To overcome these cost disparities and to protect and support the shipbuilding and shipping industries of the United States, Congress fashioned two different solutions, one for the domestic trade and one for the foreign trade.

---

1. On February 12, 1996, the Court granted Matson's motion for leave to withdraw and dismiss its complaint.

2. On February 9, 1996, the Court granted the motion of defendant-intervenors Aquarius Marine Company and Atlas Marine Company for leave to withdraw.

The Merchant Marine Act of 1920, known as the Jones Act, 46 U.S.C. app. § 883, reserves the United States domestic trade—which is defined as trade "between points in the United States, including Districts, Territories, and possessions thereof embraced within coastwise laws"—for vessels that are built in United States shipyards, owned by United States citizens and operated under the United States flag. 46 U.S.C. app. § 883. All United States shippers operating exclusively in the domestic trade thus incur equivalent costs in constructing and operating their fleets and are protected against lower-cost foreign competition which, under the Jones Act, are prohibited from operating domestically in the United States. 46 U.S.C. app. § 883.

The Merchant Marine Act of 1936 (hereafter "the Merchant Marine Act"), 46 U.S.C. app. §§ 1101 *et seq.*, authorizes the maritime agency of the United States, the Maritime Administration ("MarAd"), to provide subsidies to enable U.S.-built and -staffed vessels to compete effectively in foreign trade with foreign-built and -staffed vessels.[3] Title V of the Merchant Marine Act provides subsidies for the domestic *construction* of U.S.-flag vessels that will in turn be used exclusively in foreign trade and have to compete with foreign-flag vessels built at lower costs on foreign shipyards, so-called "construction-differential subsidies" ("CDS"). 46 U.S.C. app. §§ 1151 *et seq.* Under the CDS program, the government may pay up to half the construction costs of a U.S.-built vessel to be used in the foreign trade. 46 U.S.C. app. §§ 1151–61. Title VI of the Act provides subsidies for the *operation* of U.S.-flag ships in foreign trade, "operating-differential subsidies" ("ODS"). 46 U.S.C. app. §§ 1171 *et seq.*

To ensure that the construction subsidies granted to the CDS shippers do not give them an unfair advantage in the domestic maritime trade, Section 506 of the Act provides that the owners of vessels built with government subsidies must agree that they will operate exclusively in foreign trade. Section 506 sets forth two exceptions to this restriction. First, a CDS-built ship is permitted to operate in the domestic trade incident to a bona fide foreign voyage; the ship may sail in the domestic trade on one leg of certain overseas voyages. Second, the Secretary of Transportation may consent to the temporary transfer of a CDS-vessel to domestic trade for up to six months in any year when it is necessary to further the purposes of the Act. 46 U.S.C. app. § 1156. The shipowner, however, must refund proportionate amounts of the CDS subsidy when engaging in any domestic trade pursuant to either of these two exceptions. 46 U.S.C. app. § 1156.[4]

If a vessel is operated in the domestic trade pursuant to the first exception, the

---

**3.** MarAd was previously part of the Department of Commerce but now is part of the Department of Transportation. 46 U.S.C. app. § 1114.

**4.** Section 506 provides:

Every owner of a vessel for which a construction-differential subsidy has been paid shall agree that the vessel shall be operated exclusively in foreign trade, or on a round-the-world voyage, or on a round voyage from the west coast of the United States to a European port or ports which includes intercoastal ports of the United States, or a round voyage from the Atlantic coast of the United States to the Orient which includes intercoastal ports of the United States, or on a voyage in foreign trade on which the vessel may stop at the State of Hawaii, or an island possession or island territory of the United States, and that if the vessel is operated in the domestic trade on any of the above-enumerated services, he will pay annually to the Secretary of Transportation that pro-

portion of one-twenty-fifth of the construction-differential subsidy paid for such vessel as the gross revenue derived from the domestic trade bears to the gross revenue derived from the entire voyages completed during the preceding year. The Secretary may consent in writing to a temporary transfer of such vessel to service other than the service covered by such agreement for periods not exceeding six months in any year, whenever the Secretary may determine that such transfer is necessary or appropriate to carry out the purposes of this chapter. Such consent shall be conditioned upon the agreement by the owner to pay to the Secretary, upon such terms and conditions as he may prescribe, an amount which bears the same proportion to the construction-differential subsidy paid by the Secretary as such temporary period bears to the entire economic life of the vessel. No operating-differential subsidy shall be paid for the operation of such vessel for such temporary period.

46 U.S.C. app. § 1156.

shipowner must "pay annually to the Secretary of Transportation that proportion of one-twenty-fifth of the construction-differential subsidy paid for such vessel as the gross revenue derived from the domestic trade bears to the gross revenue derived from the entire voyages completed during the preceding year." 46 U.S.C. app. § 1156. To operate under the second exception, the shipowner must agree to "pay to the Secretary [of Transportation], upon such terms and conditions as he may prescribe, an amount which bears the same proportion to the construction-differential subsidy paid by the Secretary as such temporary period bears to the entire economic life of the vessel." 46 U.S.C. app. § 1156. The economic life is 25 years for a dry cargo ship or liner and 20 years for a liquid bulk carrier or tanker. Pub.L. No. 86–518, §§ 1, 3, 74 Stat. 216 (1960), as amended by Pub.L. No. 88–225, 77 Stat. 469 (1963); *see also* 1960 U.S.C.C.A.N. 2383, 2386–87.

The Maritime Administration has construed Section 506 to allow CDS-vessels to operate in the domestic trade after the expiration of their economic lives. Thus, in MarAd's view, ships built with government subsidies may compete domestically with ships built without such subsidies after 25 years in the case of a dry cargo ship or liner and after 20 years in the case of a liquid bulk carrier or tanker. MarAd's interpretation is not found in any formal legislative rule or regulation, but is expressed in a series of letters, memoranda, a Comptroller General decision, and other public statements dating back to 1963.

In the mid–1950's, the 1960's and the 1970's, MarAd entered into a number of CDS contracts for the construction of vessels. In all of these contracts, the parties agreed to be bound by the domestic trading restrictions of Section 506.[5] Most of the contracts also provided that the restrictions of Section 506 "shall run with the title to the Vessels and be binding on all owners thereof except the United States." *See, e.g.,* Contract No. MA/MSB–4, A.R. at 488; Contract No. MA/MSB–80, A.R. at 500; Contract No. MA/MSB–135, A.R. at 519. Other contracts provided that the operating restrictions "shall run with the title to the Vessel for the twenty-five year life of said Vessel and be binding on all owners thereof, excepting, however, the United States or any subsequent transferee of the United States." Contract No. MA/MSB–9, A.R. at 9; *see also* Contract No. FMB–48, A.R. at 3; Contract No. MA/MSB–2, A.R. at 12.[6]

### B. The Parties To This Action

Plaintiff OSG and plaintiff-intervenor Attransco, Inc. are unsubsidized domestic operators. Their vessels were built without construction-differential subsidies and are eligible for trade under the Jones Act. OSG Bulk Ships, Inc. Complaint ¶ 2. OSG owns or leases 13 U.S.-flag tankers operating in the United States domestic trade carrying oil and oil products between United States ports. OSG Bulk Ships, Inc. Complaint ¶ 2. Attransco is the owner and operator of unsubsidized tankers carrying crude oil and oil

5. *See, e.g.,* CDS Contract Between United States of America and Moore–McCormack Lines, Inc. (Oct. 7, 1955) ("Contract No. FMB–48"), Administrative Record ("A.R.") at 2–3; CDS Contract Between United States of America and Grace Line Inc. (Feb. 1, 1962) ("Contract No. MA/MSB–9"), A.R. at 8–9; CDS Contract Between United States of America and Moore–McCormack Lines, Inc. (June 29, 1962) ("Contract No. MA/MSB–2"), A.R. at 11–12; CDS Contract Between United States of America and Lykes Bros. Steamship Co., Inc. (Nov. 29, 1961) ("Contract No. MA/MSB–4"), A.R. at 487–88; CDS Contract Between United States of America and United States Lines, Inc. (June 17, 1969) ("Contract No. MA/MSB–80"), A.R. at 499–500; CDS Contract Between United States of America and Central Gulf Steamship Corporation (Mar. 22, 1972) ("Contract No. MA/MSB–135"), A.R. at 518–19.

6. The Contract between the Maritime Subsidy Board and Moore–McCormack Bulk Transport (Oct. 5, 1973) ("Contract No. MA/MSB–291"), contained language that stated that "this Article 10 [that set out the domestic trade restrictions of section 506] shall exist only during the first twenty (20) years after delivery of a Vessel by the Contractor." Exhibit A to Motion of Defendant/Intervenor Mormac Marine Transport, Inc. for Summary Judgment. *See also* CDS Contract Between United States of America and American President Lines, Ltd. (Aug. 5, 1988) ("Contract No. MA/MSB–16"), A.R. at 337. Apparently only these two contracts contained this precise language. *See* Contract No. FMB–48, A.R. at 2; Contract No. MA/MSB–2, A.R. at 10; Contract No. MA/MSB–9, A.R. at 7.

products in the domestic trade. OSG Bulk Ships, Inc. and Attransco, Inc. Complaint ¶ 2. The complaints allege that these tankers are threatened with unlawful competition from government-subsidized tankers as a result of rulings by MarAd allowing tankers built with CDS for exclusive operation in the foreign trades to be diverted instead into the domestic trades after they reach the age of 20 years. OSG Bulk Ships, Inc. and Attransco, Inc. Complaint ¶ 1.

It is undisputed that many other tankers and bulk liquid carriers will soon reach the age of 20 years and that many dry cargo ships and liners will reach the age of 25 years; several already have and already operate in the domestic trade. Plaintiff's Statement of Material Facts ¶ 12; Letter from Joseph A. Klausner, Counsel for OSG Bulk Ships, to the Court (Oct. 20, 1994). According to plaintiffs, the additional ships will add significant additional tonnage to the domestic trade and unfairly and illegally compete with plaintiffs. OSG Bulk Ships, Inc. Complaint ¶¶ 24–25, 29; Plaintiff's Statement of Material Facts ¶¶ 14–15. Plaintiffs argue that Section 506 prohibits CDS tankers from ever operating in the domestic maritime trade without continued payment to the government because otherwise the CDS-vessels would have an unfair cost advantage over non-CDS-vessels.

Defendant–Intervenors American President Lines, Ltd., Puerto Rico Maritime Shipping Authority, and Sea–Land Service, Inc. (the "Liner Defendants") each operate liners that were built with construction-differential subsidies. American President Lines owns and/or operates over ten CDS liners that will all reach age 25 within the next four years. Liner Defendants' Statement of Material Facts ¶ 10; A.R. at 477–78. Puerto Rico Maritime Shipping Authority operates five liners that either have entered or soon will enter the domestic trade. Liner Defendants' Statement of Material Facts ¶ 11. Sea–Land owns and/or operates fourteen liners that were built with CDS between 1968 and 1981. Id. at ¶ 12. Four of these CDS-vessels have already operated for over 25 years. The

remaining Sea–Land CDS-vessels will attain 25 years of age between 1997 and 2006. Id.

Defendant–Intervenors Margate Shipping Co. and Chestnut Shipping Co. (the "Tanker Defendants") and their affiliates operate ten U.S.-flag tankers in the domestic trade, including two that became 20 years old and entered the domestic trade in 1994, one that attained the age of 20 years in 1995, and two that will become 20 years old in 1997. Tanker Defendants' Statement of Material Facts ¶¶ 1, 12, 13, 16, 27, 31, 46. Defendant–Intervenor Mormac Marine Transport, Inc. operates three U.S.-flag CDS tankers; one became 20 years old in 1995 and the other two will become 20 years old in 1996 and 1997, respectively. Mormac's Statement of Material Facts ¶ 5.[7]

Defendant–Intervenor BP Oil Shipping Company is a principal user, or charterer, of tankers that operate in the domestic trade, shipping Alaska North Slope crude oil from Alaska to other United States ports. Memorandum In Support of Motion of BP Oil Shipping Company, USA, Aquarius Marine Company, and Atlas Marine Company To Intervene at 1. In addition to seeking to use or charter the tankers of Aquarius Marine Co. and Atlas Marine Co. once their domestic trading restrictions are lifted, BP Oil Shipping already charters the services of a 20–year old tanker operated by defendant-intervenor Margate Shipping. Id. at 2–3.

## II. ANALYSIS

Plaintiffs seek a declaration that the restrictions of Section 506 against operation in the domestic trade by a vessel built with construction-differential subsidies run for the entire life of the vessel and do not expire when the vessel reaches a minimum age or at any other time. Defendants and defendant-intervenors argue that over a 30–year period MarAd has consistently interpreted Section 506 to impose domestic trading restrictions on vessels constructed with CDS only during their "economic" or "statutory" life, which for tankers is 20 years and for dry cargo and passenger vessels is 25 years. They main-

---

**7.** Mormac intervened separately from the other Tanker Defendants because of the unique clauses in its contract for the subsidized construction of its three CDS tankers.

tain that after the expiration of the economic or statutory life of such ships, they no longer are restricted from entering the domestic trade.

The Court agrees with defendants. The Supreme Court's unanimous decision in *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980), requires the Court to conclude that the trading restrictions expire when either the CDS-shipowner pays back the unamortized subsidy or the subsidy becomes fully amortized at the end of the economic life of the ship. In addition, because the statute is silent with respect to whether the domestic trading restrictions last forever or lapse after 20 or 25 years, the Court concludes that it should defer to MarAd's reasonable, long-standing and consistent interpretation of the Merchant Marine Act, which MarAd has the sole authority to administer.

### A. MarAd's Interpretation Of Section 506 Of The Merchant Marine Act Is Consistent With Supreme Court Precedent

In *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980), Seatrain received a construction-differential subsidy to construct a supertanker, the Stuyvesant. Seatrain agreed to operate the vessel exclusively in foreign trade unless otherwise authorized by Section 506 of the Merchant Marine Act. By the time construction of the vessel was completed, however, there no longer was any demand for the use of the Stuyvesant in the foreign trade as a result of the Arab oil embargo. To counter this problem and to take advantage of the growing need for transportation of Alaskan crude from Valdez to ports in the Eastern United States, Seatrain requested that the Stuyvesant be released from the restrictions on its operation in domestic trade in exchange for Seatrain's repayment of the vessel's CDS. The Secretary of Commerce granted Seatrain's request. *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. at 576–78, 100 S.Ct. at 803–04. Shell Oil, Alaska Bulk Carriers and Trinidad Corporation filed lawsuits, arguing that the Secretary had no authority under the statute to do so.

The Supreme Court held that while Section 506 permitted temporary releases from the foreign-trade-only requirement in two specific situations, it did not speak to the availability of permanent releases from the requirement but certainly did not forever bar CDS-built vessels from entering the domestic trade. Rather, the Court concluded that it was consistent with the statute to permit an owner to obtain a permanent release from the domestic trading restriction by buying out the remaining subsidy on its CDS-vessel and that the Secretary had broad discretion to grant such a release. *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. at 587–90, 100 S.Ct. at 809–11.

The Supreme Court found that Congress had expressed no clear intention regarding permanent releases from the Section 506 restrictions. The Court determined that the language of the Act and its legislative history reflected an intent by Congress to grant the Secretary of Commerce broad authority to administer it. *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. at 585, 100 S.Ct. at 808. Because it found no language in the statute suggesting that Congress intended to rule out permanent releases from the domestic trading restrictions of Section 506, the Court rejected the view that "the Secretary's authority to approve entry of subsidized vessels into the domestic trade" was limited to "the specific exceptions in § 506." *Id.* at 587–88, 100 S.Ct. at 809–10. It concluded that the Secretary had the authority under the statute to approve a permanent release from the domestic trading restrictions.

The Court also considered whether the Secretary's construction of the Act was reasonable. It observed that "a permanent release from the foreign-trade-only requirement may quite directly further the general goals of the Act by ... improving the chances that a domestic shipyard will survive." *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. at 588, 100 S.Ct. at 809. It stated that a permanent release

confers no windfall. On the contrary, at least where repayment of the CDS includes some amount reflecting capital costs which would have been incurred had no subsidy been available, such a transaction

merely permits a once subsidized vessel to enter the domestic trade on a footing equal to that of vessels already in that trade. It was not the purpose of the Act to prohibit such entry, and we accordingly agree with the District Court that *"nothing* in section 506, [or] in any other provision of Title V, ... either expressly or implicitly addresses the issue of *permanent* revocation of a CDS contract."

*Id.* at 589–90, 100 S.Ct. at 810 (emphasis in original) (citations omitted).

The critical issue before this Court is closely analogous to that addressed by the Supreme Court in *Seatrain:* whether Section 506's domestic trading restrictions permanently bar CDS-built vessels from entering the domestic trade. The Supreme Court found that they do not in the context of a "permanent-release/full-repayment transaction." *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. at 595, 100 S.Ct. at 813. This Court finds that they do not in the context of the expiration of a vessel's statutory economic life. *Seatrain* instructs that a CDS-vessel may purchase its release from the domestic trading restriction by repaying a steadily decreasing unamortized portion of the subsidy, an amount that becomes zero at the end of the ship's statutory economic life. Once the subsidy has been fully amortized over the economic life of the vessel, then nothing remains to be paid for the CDS-vessel to gain release from the foreign-trade-only restrictions.

Plaintiffs assert that *Seatrain* did not give CDS-vessel owners the statutory right to repay the subsidy to gain a release, but merely recognized that the Secretary has some discretion on a case-by-case basis to allow a CDS-vessel owner to buy out its remaining subsidy. They argue that *Seatrain* involved MarAd's contracting discretion, while this case involves MarAd's ability to construe the scope of the Section 506

domestic trading restrictions more globally. Plaintiffs' reading of *Seatrain* is far too narrow. *Seatrain* repeatedly speaks to the Secretary's broad authority to oversee administration of the Act, not just to his authority to enter into contracts for repayment of the subsidy. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. at 583–84, 585, 586, 588, 100 S.Ct. at 807–08, 808, 808–09, 809–10. Furthermore, in *Liberty Maritime Corp. v. United States,* 928 F.2d 413, 419 (D.C.Cir.1991), our Court of Appeals concluded that Congress gave the Secretary of Transportation broad administrative authority to oversee the administration of the Merchant Marine Act and that his authority extends beyond his contracting authority and allows him reasonably to interpret his discretion under various provisions of the Act.

*Seatrain* controls this case and requires the Court to conclude that MarAd has the discretion to construe the Act as it does. Just as a CDS-vessel may be released from the restrictions upon payment of its remaining unamortized subsidy, the domestic trading restrictions lapse at the expiration of the statutory economic life of the CDS-vessel, that is, upon full amortization of the subsidy.[8]

### B. The Court Should Defer To MarAd's Reasonable And Permissible Interpretation Of Section 506

■■■ In deciding the weight to accord an agency interpretation, the Court first must determine "whether Congress has directly spoken to the precise question in issue." *Chevron, U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). To determine whether the intent of Congress is clear and unambiguous, the Court must examine the text, the structure and the legislative history of the Act. *Coal Employment Project v. Dole,* 889 F.2d 1127, 1131 (D.C.Cir.1989). "If the statute is clear

8. The Court rejects plaintiffs' argument that Section 505 of the Supplemental Appropriations Act of 1987 implicitly overruled *Seatrain.* The 1987 Supplemental Appropriations Act addressed neither *Seatrain* nor Section 506, but only imposed restrictions on MarAd's use of appropriated funds, including a limitation on MarAd's use of funds to promulgate rules governing buy-outs of

CDS contracts. There was no implicit rejection of the *Seatrain* decision. Furthermore, Congress must be explicit in an appropriations act for the Court to conclude that Congress has made a substantive change in a statute. *See National Treasury Employees Union v. Devine,* 733 F.2d 114, 117 n. 8 (D.C.Cir.1984).

and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) (quoting *Board of Governors, FRS v. Dimension Financial Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986); *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. at 842–43, 104 S.Ct. at 2781). If the intent of Congress is ambiguous or if the statute is silent, and if the agency itself has reasonably interpreted the statute in a particular way, "the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, ... the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. at 843, 104 S.Ct. at 2782; *see National Recycling Coalition, Inc. v. Browner*, 984 F.2d 1243, 1251 (D.C.Cir.1993).

### 1. The Statute Is Ambiguous

■ To determine whether Congress has directly spoken to the question at issue in this case, the Court is guided by the Supreme Court's examination of Section 506 of the Merchant Marine Act in *Seatrain*. Although the Court in *Seatrain* did not consider the precise issue of whether the domestic trading restrictions lapse with the end of a CDS-vessel's economic life, it did address the closely analogous issue of whether the domestic trading restrictions were permanent. The Supreme Court found that Congress had not directly spoken to the issue, stating that "*nothing* in section 506, [or] in any other provision of Title V, ... either expressly or implicitly addresses the issue of *permanent* revocation of a CDS contract." *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. at 590, 100 S.Ct. at 810 (quoting *Shell Oil Co. v. Kreps*, 445 F.Supp. 1128, 1135 (D.D.C. 1978)). It noted, however, that "[t]here [was] no language suggesting that Congress intended to rule out permanent releases [of

Section 506's domestic trading restrictions]," *id.* at 594, 100 S.Ct. at 812–13, and that "[a]t most, we find the legislative history ambiguous, even puzzling." *Id.* at 590, 100 S.Ct. at 810. This Court concludes that the language, structure and legislative history of Section 506 are equally inconclusive with respect to the question presented here: whether the domestic trading restrictions expire after the conclusion of the statutory economic life of CDS-financed vessels.

As to the language of the statute, plaintiffs maintain that there is no time limit on the foreign-trade-only restriction because Section 506 states without qualification that every vessel built with CDS "shall be operated exclusively in foreign trade" and does not on its face set a time limit for the domestic trading restrictions. In contrast, defendants contend that inclusion of the language in Section 506 regarding repayment of CDS subsidies when a CDS-vessel is operated in the domestic trade pursuant to the Section's two exceptions establishes a statutory economic life for CDS-vessels, the end of which releases the vessel from its domestic trading restrictions. The Court finds that the plaintiffs infer too much from Congress' silence regarding any time limit on the restrictions, while defendants read too much into the fact that Section 506 incorporates a statutory economic life for the vessels. The fact is that Section 506 does not explicitly state what happens at the end of a vessel's economic life; it is silent on the issue of whether the restrictions lapse after a CDS-vessel has been in service a certain number of years.[9]

The parties' arguments regarding legislative history also fail to reveal an unambiguous congressional intent concerning the issue before the Court. The legislative history of the 1936 statute and the 1938 and 1960 amendments are ambiguous and inconclusive regarding the consequence of the lapse of the statutory economic life of a CDS-vessel. One can find inferential support in the legislative history for plaintiffs' position that the domestic trading restrictions were intended to be

---

**9.** Plaintiffs' assertion that because other sections of the Act have specific time limitations, Section 506's lack of a time limitation on the restrictions means that they extend indefinitely is unpersuasive. Plaintiffs' reliance on other sections, which serve purposes different from those of Section 506, does not demonstrate the plain meaning of Section 506.

permanent and for defendants' position that they lapse after the running of a CDS-vessel's statutory economic life. But the parties point to no persuasive legislative history demonstrating a clear congressional intent on the issue. Rather, they rely on lengthy excerpts from testimony before Congressional committees by industry members or MarAd administrators, statements during hearings by legislators who were not sponsors of any of the bills that led to the enactment, and statements by legislators during floor debates. These are not persuasive authorities on congressional intent, particularly when they are in conflict. *See Brock v. Pierce County*, 476 U.S. 253, 263, 106 S.Ct. 1834, 1840–41, 90 L.Ed.2d 248 (1986); *Chrysler Corp. v. Brown*, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979); *Schwegmann Bros. v. Calvert Distillers*, 341 U.S. 384, 394–95, 71 S.Ct. 745, 750–51, 95 L.Ed. 1035 (1951); *Public Citizen v. Farm Credit Admin.*, 938 F.2d 290, 292 (D.C.Cir.1991); *Austasia Intermodal Lines v. Federal Maritime Comm'n*, 580 F.2d 642, 645 (D.C.Cir. 1978).[10]

#### 2. MarAd's Interpretation Is Reasonable

[5] Having concluded that the statute is ambiguous or silent with respect to the issue before the Court, the Court next must determine whether Congress delegated to the relevant agency authority to administer the statute and whether the agency's interpretation "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent." *Rust v. Sullivan*, 500 U.S. 173, 184, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991) (citing *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. at 842, 104 S.Ct. at 2782.) "The

court must defer to the agency's interpretation so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language." *Coal Employment Project v. Dole*, 889 F.2d at 1131 (citations omitted). In this case, the Court must ensure that MarAd's interpretation "is arguably consistent with the underlying scheme in a substantive sense" and must ascertain "whether 'the agency considered the matter in a detailed and reasoned fashion.'" *Rettig v. Pension Benefit Guaranty Corp.*, 744 F.2d 133, 151 (D.C.Cir.1984) (quoting *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. at 865, 104 S.Ct. at 2793). Because Congress gave MarAd "broad authority to oversee administration of the Act," *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. at 585, 100 S.Ct. at 808, the "agency's interpretation must be accepted 'unless it is manifestly unreasonable.'" *Liberty Maritime Corp. v. United States*, 928 F.2d at 419 (quoting *National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 174 (D.C.Cir.1982)).

#### a. MarAd's interpretation does not conflict with the statute's plain language

■ Section 506 of the Merchant Marine Act provides that "[e]very owner of a vessel for which a construction-differential subsidy has been paid shall agree that the vessel shall be operated exclusively in foreign trade . . . ." 46 U.S.C. app. § 1156. At the same time, the statute provides that "if the [CDS-built] vessel is operated in the domestic trade . . . , [the owner] will pay annually . . . that proportion of one-twenty-fifth of the construction-differential subsidy paid for such vessel . . . ." 46 U.S.C. app. § 1156. This latter provision is applicable either

---

10. Nor is the parties' focus on the significance of a proposed amendment to Section 506 that Congress *rejected* in 1963 particularly helpful. Proposed Section 2 of S. 1172 would have amended Section 506 by adding the following sentence: "Such annual payments shall terminate at the end of the vessel's useful life for depreciation purposes as provided in section 607 of the Merchant Marine Act, 1936." The Senate Report accompanying S. 1172 deleted section 2 "in its entirety." 1963 U.S.C.C.A.N. 1346–1351. S.Rep. No. 474, 88th Cong., 1st Sess. 1, 3 (1963). Plaintiffs argue that the effect of the deletion is to show that payments required by Section 506 do not terminate at the end of the vessel's useful life

for depreciation purposes, but persist to the end of its operational life. Defendants assert that section 2 was deleted because Section 506 already accomplished the purpose of Section 2; the formula already included in Section 506 regarding proportional repayment of the CDS for domestic operation would by its application complete the statutory life of the vessel such that no more refunds of the subsidy would be required after 25 years (20 for tankers). While the Court's review of the legislative history of the rejected amendment suggests that defendants have the better of the argument, both interpretations of the deletion are plausible. The intent of Congress is not clear and unambiguous.

when a portion of a CDS-built vessel's voyage is in the domestic trade or if the shipowner seeks a temporary transfer of the CDS-built vessel to the domestic trade. The Supreme Court has examined these provisions and determined that they speak "to *temporary* releases from the foreign-trade-only requirement, and *only* to such releases." *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. at 588, 100 S.Ct. at 809. Because nothing in Section 506, or in any other provision of Title V, expressly addresses the issue of *permanent* release from the domestic trading restrictions, MarAd's interpretation does not conflict with the statute's plain language. The language of the statutory provision at issue suggests that Congress did not intend that the domestic trading restrictions of Section 506 would permanently bar CDS-built vessels from entering into the domestic trade.

### b. MarAd's interpretation is consistent with the statutory purpose of the Merchant Marine Act

■■■ In its interpretation of a statute, an agency must provide "a reasonable explanation for its conclusion that [its interpretation] serve[s] the [objectives of the statute in question]." *Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. at 863, 104 S.Ct. at 2792; *see Continental Air Lines, Inc. v. Department of Transportation,* 843 F.2d 1444, 1452 (D.C.Cir.1988). Reasonableness in the context of a *Chevron* review of an agency's interpretation of a statute primarily "means . . . the compatibility of the agency's interpretation with the policy goals . . . or objectives of Congress." *Continental Air Lines, Inc. v. Department of Transportation,* 843 F.2d at 1452. Congress expressed the primary purpose of the Merchant Marine Act as follows: "It is declared to be the policy of the United States to foster the development and encourage the maintenance of . . . a merchant marine." 46 U.S.C. app. § 1101; *see Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. at 584, 100 S.Ct. at 807–08. Congress intended to assist U.S.-flag vessels in gaining parity with foreign competition in foreign trade. *See* S.Rep. No. 713, 74th Cong., 1st Sess., 3 (1935) (Report of the Committee on Commerce on the Merchant Marine Act of 1935). In Section 506 of the Act, Congress also sought to protect the unsubsidized United States shipowners operating in the domestic trade from competition from subsidized United States shipowners. *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. at 586–87, 100 S.Ct. at 808–09. Thus, the goal of Section 506 is to ensure that the domestic shippers were protected from unfair competition from the CDS-subsidized fleet.

MarAd's interpretation is compatible with Section 506's objective of protecting the domestic fleet from unfair competition. In addition, MarAd has sufficiently explained the compatibility of its interpretation with this objective. In 1964, the Acting General Counsel of MarAd stated that an owner who has operated a vessel in the foreign trade "for the statutory life of the vessel . . . should be in the same position as if he had paid the full domestic price; that is, he should not be required to make further repayments, and should not be bound to an exclusive foreign trade obligation." Memorandum from Graydon L. Andrews, Acting General Counsel, Maritime Administration, to Maritime Subsidy Board, Maritime Administration (July 28, 1964), A.R. at 24. Such an owner would be "in the same relative position as a domestic carrier who had paid the U.S. costs of his ship." *Id.* The Acting General Counsel's explanation was subsequently included in a Comptroller General's 1964 opinion, concluding that two vessels were allowed to gain a permanent release from the domestic trading restrictions. Comptroller General Decision B–155039, 44 Comp.Gen. 180 (1964), A.R. at 31.

Plaintiffs contend that MarAd's interpretation is not consistent with the intent of Congress because Congress also intended to retire and replace obsolescent subsidized vessels and therefore not to allow them to compete in the domestic trade. Similarly, they maintain that the legislative history of the Act reveals that Congress intended to stimulate continued renewal of the American merchant marine. Plaintiffs' arguments are based on the congressional intent for Sections 507, 508 and 510, which were enacted to address the obsolescence of World War I

tonnage. 46 U.S.C. app. §§ 1157, 1158, 1160. These sections have little bearing on the purpose of Section 506 and are not the proper touchstones for a *Chevron* analysis of whether MarAd's interpretation of Section 506 is consistent with the purposes of the Act. *See Continental Air Lines, Inc. v. Department of Transportation*, 843 F.2d at 1451–52.

3. MarAd's Long–Standing Interpretation Of Section 506 Is A Permissible And Reasonable Exercise Of Its Delegated Authority

■ Plaintiffs assert that MarAd's interpretation of Section 506 is not entitled to *Chevron* deference because it is conclusory, unreasoned, has been only informally announced and is not the subject of any promulgated rules. Plaintiffs argue that the agency's more considered reasoning has only been offered during this litigation and therefore should receive no deference. As to this last point, they rely on this Circuit's decision in *Georgetown Univ. Hosp. v. Sullivan*, 934 F.2d 1280, 1283 n. 3 (D.C.Cir.1991).

Plaintiffs' reliance on *Georgetown Univ. Hospital v. Sullivan* is misplaced. MarAd's interpretation of Section 506 was not offered for the first time in the context of this litigation but has been its consistent, long-standing interpretation of Section 506 since at least 1963. A careful review of MarAd's interpretation persuades the Court that it should defer to the agency's position. *See City of Mesa, Arizona v. FERC*, 993 F.2d 888, 893 (D.C.Cir.1993).

In 1963, in a letter to the Chairman of the House Committee on Merchant Marine and Fisheries, the General Counsel of the Department of Commerce, the department then responsible for administration of the Merchant Marine Act, expressed MarAd's view that the "obligation to repay construction-differential subsidy for operation in domestic trade was intended to be, and should be, terminated at the end of the economic lives of the vessels." Letter from Robert E. Giles to the Hon. Herbert J. Bonner (July 10, 1963), A.R. at 14–15. In a 1964 letter, the General Counsel of MarAd notified a shipper that MarAd "believe[s] Section 506 of the Merchant Marine Act, 1936, as originally enacted, was intended to terminate the obligation to repay construction-differential subsidy for the operation of the vessels in domestic trade at the end of the economic lives of the vessels. We are still of that opinion." Letter from Robert J. Ables, General Counsel, Maritime Administration, to Warren Bean, Staff Attorney, Matson Navigation (Feb. 4, 1964), A.R. at 19.

In 1964, MarAd confronted the question of whether it had the legal authority to amend CDS contracts between Grace Line Inc. and the Federal Maritime Board to remove from those contracts the domestic-trading restrictions. The Acting General Counsel of MarAd advised the Maritime Subsidy Board that

> ... the elimination of the exclusive foreign trade obligation can be effected by the expiration of the vessel's statutory life or by the repayment of the unamortized subsidy.

> .    .    .    .    .

> ... Upon the basis of the rationale for the repayment of subsidy, it appears that if the Government receives the full benefit of its subsidy by the Owner's operation in the foreign trade and the compliance with the other construction differential subsidy contract obligations for the statutory life of the vessel, or if, in the case of a vessel with an age less than the statutory life, the unamortized subsidy is repaid to the Government, the Owner should be in the same position as if he had paid the full domestic price; that is, he should not be required to make further repayments, and should not be bound to an exclusive foreign trade obligation. Stated another way, the repayment in full of any undepreciated balance (based upon the statutory life cycle) of the subsidy, would place the Owner of a vessel on which construction-differential subsidy had been paid in the same relative position as a domestic carrier who had paid the U.S. costs for his ship....

Memorandum from Graydon L. Andrews, Acting General Counsel, Maritime Administration, to Maritime Subsidy Board, Maritime Administration (July 28, 1964), A.R. 20–25. The General Counsel of the Department

of Commerce concurred with the conclusions in the memorandum. A.R. at 25, 26.

Thereafter, the Secretary of Commerce referred the Grace Line matter to the Comptroller General of the United States, who concluded that the two vessels owned by Grace Line were permitted to repay the unamortized portion of their subsidies in exchange for the removal of the domestic-trading restrictions. After examining the Merchant Marine Act and its legislative history, the Comptroller General concurred with the conclusions reached by MarAd and the Department of Commerce, stating that:

[I]t appears clear that the requirement for repayment of construction-differential subsidy for domestic operation would cease when a vessel reaches the end of its statutory life period. . . .

. . . [I]f the Government receives the full benefit of its subsidy by the owner's operations in the foreign trade and the compliance with the other construction-differential subsidy contract obligations for the statutory life of the vessel, or if, in the case of a vessel which has not reached the end of its statutory life, the unamortized subsidy is repaid to the Government, the owner should be in the same position as if he had paid the full domestic price of the vessel; that is, he should not be required to make further repayments and should not be bound to operate the vessel exclusively in the foreign trade.

Comptroller General Decision B–155039, 44 Comp. Gen. 180 (1964), A.R. at 31.

In a 1966 memorandum from the General Counsel of MarAd, MarAd described the Comptroller General's decision as ruling

that a vessel built with construction-differential subsidy could be freed from the restrictive provisions of Section 506 of the Merchant Marine Act, 1936, as amended, if the vessel was operated in the foreign trade and in full compliance with other CDS contract provisions for its statutory life period. . . . The Comptroller General

also said that "it appears clear that the requirement for repayment of construction-differential subsidy for domestic operation would cease when a vessel reaches the end of its statutory life period."

Memorandum from the General Counsel, MarAd, to Chief, Office of Ship Operations, MarAd (Jan. 17, 1966), A.R. at 45–46. MarAd has consistently reaffirmed the Comptroller General's decision in numerous other memoranda. *See* A.R. at 459, 462, 465–67, 474.

In 1983 and 1985, MarAd published Notices of Proposed and Final Rulemaking implementing 46 C.F.R. Part 276, which set forth MarAd's policy for considering requests for repayment of CDS. In the background section to the proposed and final rule, MarAd reiterated its interpretation of Section 506 that "domestic trading restrictions for each CDS-built vessels [sic] lapse at the end of the vessel's statutory life." 50 Fed.Reg. 19170, 19170 (May 7, 1985), A.R. at 248. *See* 48 Fed.Reg. 4408, 4408 (Jan. 31, 1983), A.R. at 142. The regulation was subsequently vacated by the Court of Appeals because the Secretary had failed to provide an adequate statement of basis and purpose. *Independent United States Tanker Owners Comm. v. Dole,* 809 F.2d 847, 854 (D.C.Cir.), *cert. denied,* 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987).

In 1987, MarAd published notices of proposed and final rulemaking to implement a rule that allowed four vessels that had repaid their CDS to operate in the domestic trade. Again, MarAd reiterated in the background description that "[a]ll domestic trading restrictions for each CDS-built vessel lapse at the end of the vessel's statutory life." 52 Fed.Reg. 12199, 12200 (Apr. 15, 1987), A.R. at 258; 52 Fed.Reg. 23522, 23522 (June 22, 1987), A.R. at 320. This rule was subsequently upheld. *Independent United States Tanker Owners Comm. v. Skinner,* 884 F.2d 587, 588 (D.C.Cir.1989), *cert. denied,* 495 U.S. 904, 110 S.Ct. 1922, 109 L.Ed.2d 286 (1990).[11]

---

11. The Court is not suggesting that the mention of an interpretation in the preamble to a rule transforms the statement into a binding legislative rule; the preamble is not subject to notice and comment. *See National Family Planning* *and Reproductive Health Ass'n, Inc. v. Sullivan,* 979 F.2d 227, 239 (D.C.Cir.1992). But it may be considered for *Chevron* purposes in deciding whether the agency has had a consistent and long-standing interpretation of a statute.

In letters dating from 1989 to 1992 to maritime industry members, MarAd reiterated its position that domestic trading restrictions expire at the end of 25 years from delivery of dry cargo ships and liners built with construction-differential subsidies and 20 years from delivery of CDS-built tankers. *See* A.R. at 338, 345, 347, 348, 349, 351, 354. On June 6, 1989, for example, MarAd issued a letter of advice to Matson Navigation Company, stating that "the domestic trading restrictions expire at the end of 25 years (20 years for a tanker) from the delivery of the vessel." A.R. at 338. On June 8, 1992, MarAd issued a letter of advice to Attransco, stating that MarAd's "position has been that domestic trading restrictions expire at the end of 20 years from delivery of the CDS-built tanker." A.R. at 347; *see also* Letter from MarAd to Keystone Shipping Co. (Oct. 20, 1992), A.R. at 348.

4. While MarAd's Interpretation Is Not Contained In A Formal Rule, It Is Still Entitled To *Chevron* Deference

■■■ *Chevron* deference is premised on Congress' explicit or implicit delegation of interpretative authority to an agency because the agency is in a better position than a court to make policy decisions in the face of statutory ambiguity. As the Supreme Court has stated:

> [A]n agency to which Congress has delegated policy-making responsibilities may, *within the limits of that delegation,* properly rely upon the incumbent administration's views of wise policy to inform its judgments.... [I]t is entirely appropriate for [the Executive Branch] to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged

with the administration of the statute in light of everyday realities.

*Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. at 865–66, 104 S.Ct. at 2793 (emphasis added). "[D]eference to an agency's interpretation constitutes a *judicial* determination that Congress has delegated the norm-elaboration function to the agency and that the interpretation falls within the scope of that delegation." *Montana v. Clark,* 749 F.2d 740, 746 (D.C.Cir.1984) (citation omitted), *cert. denied,* 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985).

■■ While MarAd's interpretations of Section 506 are not contained in a "formal" legislative rule promulgated pursuant to the notice and comment rulemaking procedures of the Administrative Procedure Act, they nevertheless are entitled to deference because of the status conferred on the agency as the delegate of Congress and by its expertise with respect to its governing statute. *Wagner Seed Co. v. Bush,* 946 F.2d 918, 921–22 (D.C.Cir.1991), *cert. denied,* 503 U.S. 970, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992); *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1565–67 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). As in the formal rulemaking context, MarAd's interpretation here is still to be measured by the *Chevron* yardstick of reasonableness. *Continental Air Lines v. Department of Transportation,* 843 F.2d at 1449; *see Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1497 (D.C.Cir.1988). Despite plaintiffs' arguments to the contrary, "[i]t simply is not the law of this circuit that an interpretive regulation does not receive the *Chevron* deference accorded a legislative regulation." *Wagner Seed Company, Inc. v. Bush,* 946 F.2d at 922.[12]

---

**12.** Other cases in this Circuit suggest that less deference should be given to such interpretations than to rules. *See Vietnam Veterans of America v. Secretary of the Navy,* 843 F.2d 528, 536–38 (D.C.Cir.1988); *National Latino Media Coalition v. FCC,* 816 F.2d 785, 788 (D.C.Cir.1987). And the Supreme Court has stated that interpretive rules, even though not subject to the "rigors of the Administrative Procedure Act ... [are] still entitled to some deference ... [when they are] permissible construction[s] of the statute," with the implication that such interpretive rules are entitled to less than full *Chevron* deference.

*Reno v. Koray,* —— U.S. ——, ——, 115 S.Ct. 2021, 2027, 132 L.Ed.2d 46 (1995). *See Martin v. OSHRC,* 499 U.S. 144, 157, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117 (1991) (promulgation of interpretive rules and agency enforcement guidelines entitled to some weight on judicial review).

The Court finds that MarAd's consistent 33-year reading of Section 506 partakes more of the binding, legislative quality of the interpretation upheld in *Wagner Seed* than the interpretive rules or policy memoranda discussed in *Reno v. Koray* or *Vietnam Veterans v. Secretary of the Navy.*

Taken together, MarAd's numerous, consistent and reasonable pronouncements since 1963 on the issue before the Court support the Court's conclusion that the agency has not exceeded the limits of the broad authority that Congress granted first the Secretary of Commerce and then the Secretary of Transportation (and through them, the Administrator of MarAd) to oversee the administration of the Merchant Marine Act. The agency has considered and explained its interpretation of Section 506 in a detailed and reasoned fashion consistent with the statutory purpose. *See Theodus v. McLaughlin*, 852 F.2d 1380, 1386–87 (D.C.Cir.1988). MarAd's interpretation is a permissible and reasonable interpretation of an ambiguous statute, consistent with the goals and objectives of Congress. It therefore is entitled to deference. *See National Association of Regulatory Utility Commissioners v. SEC*, 63 F.3d 1123, 1126 (D.C.Cir.1995); *Used Equipment Sales, Inc. v. Department of Transportation*, 54 F.3d 862, 865 (D.C.Cir.1995).

The Court also concludes that the Comptroller General's 1964 opinion should be considered in the deference analysis. While in general "when an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference," *Department of Treasury v. FLRA*, 837 F.2d 1163, 1167 (D.C.Cir.1988), the Comptroller General issued its decision pursuant to his authority to respond to a request from the head of an executive agency relating to payments by the agency. 31 U.S.C. § 3529. In addition, the Merchant Marine Act expressly gives the Comptroller General responsibility to audit the financial transactions of the Secretary of Transportation and therefore of MarAd. 46 U.S.C. app. § 1117. Furthermore, it is apparent that the Comptroller General relied on and incorporated parts of the 1964 memorandum of Mar-

Ad's Acting General Counsel into his opinion. *See* A.R. at 20–24. Finally, the Supreme Court relied on the same decision of the Comptroller General to support its conclusion in *Seatrain* that "the agency has consistently interpreted the Act to permit full-repayment/permanent-release arrangements." *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. at 595, 100 S.Ct. at 813. For these reasons, the Comptroller General's opinion should receive the same deference from the Court as if it were an interpretation of the Act by MarAd itself. *See Midtec Paper Corp. v. United States*, 857 F.2d at 1496–97; *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37–38, 102 S.Ct. 38, 44–45, 70 L.Ed.2d 23 (1981).

The Court would not reach a different conclusion even if it were to determine that because MarAd's interpretation was not promulgated pursuant to notice and comment rulemaking, it has no legal effect apart from the agency's ability to persuade this Court that its view is correct. *See Used Equipment Sales, Inc. v. Department of Transportation*, 54 F.3d at 867. The Court would still give considerable weight to the several instances where MarAd offered an interpretation of the Act with respect to the lapse of domestic trading restrictions at the end of a vessel's statutory economic life. *See Knutzen v. Eben Ezer Lutheran Housing Center*, 815 F.2d 1343, 1349–50 (10th Cir.1987). As the Court already has noted, MarAd's interpretation is of longstanding and consistent application. *Haig v. Agee*, 453 U.S. 280, 303, 101 S.Ct. 2766, 2780, 69 L.Ed.2d 640 (1981); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); *City of Mesa, Arizona v. FERC*, 993 F.2d at 893; *TRT Telecommunications Corp. v. FCC*, 876 F.2d 134, 149 (D.C.Cir.1989).

Furthermore, as Justice Scalia has pointed out, the theory that an agency's interpretations (as opposed to its rules and regulations) have only the force of their "power to persuade" had its genesis in the pre-*Chevron* "era when we were disposed to give deference (as opposed to 'persuasive force') only to so-called 'legislative regulations.' ... In an era when our treatment of agency positions is governed by *Chevron*, the 'legislative rules vs. other action' dichotomy ... is an anachronism...." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 259–60, 111 S.Ct. 1227, 1236, 113 L.Ed.2d 274 (Scalia, J., concurring). Agencies "without explicit rulemaking power" could never issue so-called "legislative rules," but they are still entitled to deference; and their "interpretation[s] of ambiguous language need only be reasonable to be entitled to deference." *Id.* at 259–60, 111 S.Ct. at 1236 (citing *EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 115, 108 S.Ct. 1666, 1671, 100 L.Ed.2d 96 (1988)).

Finally, even without *Chevron* deference, the Court would be persuaded that the agency's view is correct because it is consistent with the Supreme Court's decision in *Seatrain,* where the Supreme Court deferred to an analogous MarAd construction of Section 506, *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. at 595, 100 S.Ct. at 813, and with the Comptroller General's decision that domestic trading restrictions lapse at the end of the statutory economic lives of CDS-vessels. Comptroller General Decision B–155039, 44 Comp. Gen. 180(164), A.R. at 31.

### 5. MarAd's Contracting Practices Neither Conflict With Nor Support Its Interpretation

The final matter that bears mention is the suggestion by plaintiffs that MarAd's consistent practical implementation of the Act's mandates through its contracting authority shows a longstanding interpretation by MarAd that is inconsistent with the letters, memoranda and public statements just discussed. They point to contracts entered into between MarAd and shipowners for the construction of CDS-vessels and assert that in 122 out of 127 contracts the Section 506 restrictions run with the vessel's title without any express time limitation, and therefore run indefinitely. *See, e.g.,* Contract No. MA/MSB–4, Articles 3, 4(c), 5, 6, A.R. at 488; Contract No. MA/MSB–135, Articles IX(c), X, XI, XIII(b), A.R. at 518. These contracts, they argue, reflect the correct long-standing construction of the Act. They assert that the agency's current view conflicts with this construction.

Defendants respond that if MarAd did not include specific language time-limiting the domestic trading restrictions in various contracts, it is because it was commonly understood by both MarAd and the maritime industry that the restrictions were time-limited by the statute. They also maintain that the contracts must be read in the context of MarAd's repeated public statements that the Section 506 domestic trading restrictions lapse when a CDS-vessel reaches the end of its statutory life. Further, they claim that

just because a restriction is to run with the title does not mean, as plaintiffs contend, that it runs indefinitely unless expressly time limited.

Defendants also contend that plaintiffs have misconstrued the contracts and offer different interpretations of the same provisions cited by plaintiffs. In addition, defendants cite to different contract provisions in the very same contracts that they claim show that the Section 506 restrictions are limited to the 20 or 25 year life of the vessels. *See, e.g.,* Contract No. MA/MSB–4, Article 7, A.R. at 488; Contract No. MA/MSB–135, Article XIII, A.R. at 518.

The most pertinent language in the contracts cited by the parties first restates the restrictions of Section 506 of the Act and then adds that these restrictions "shall run with the title to the Vessels and be binding on all owners thereof...." *See, e.g.,* Contract No. MA/MSB–4, A.R. at 488. Even though other provisions state that particular time limits apply for other purposes, this does not lead to the conclusion that the lack of a specific time limit in the provision restating Section 506 means that it runs indefinitely. Plaintiffs' arguments with respect to the contracts mirror their arguments with respect to the plain meaning of the Act. Once again, the language is not so plain as plaintiffs would have it. On the other hand, defendants have not persuaded the Court that the contracts reveal an interpretation of Section 506 that clearly supports their position. While "both parties have scored debating points" on this, their final argument, *Continental Air Lines, Inc. v. Department of Transportation,* 843 F.2d at 1448, in the end, the contract argument is a wash.[13]

### III. CONCLUSION

MarAd's interpretation of Section 506 of the Merchant Marine Act is consistent with the Supreme Court's decision in *Seatrain Shipbuilding Corp.* It is not foreclosed by the language or legislative history of

---

13. The argument is not a wash, however, as to defendant-intervenor Mormac Marine Transport, Inc. The language in its contract clearly shows that the domestic trade restrictions were to end 20 years after the delivery of the Mormacstar, the Mormacsun and the Mormacsky. Agreeing to this clause was clearly within the contracting discretion of MarAd. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. at 588, 100 S.Ct. at 809–10; *see also supra* note 7.

the statute and is rational and well reasoned; it is both long-standing and consistent. The Court therefore holds that the domestic trading restrictions of Section 506 of the Merchant Marine Act lapse at the end of 25 years for a dry cargo ship or liner and 20 years for a liquid bulk carrier or tanker. *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980); *Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). An Order consistent with this Opinion is issued this same day.

SO ORDERED.

### *ORDER*

Upon consideration of Plaintiffs' Motion for Summary Judgment, Defendants' Motion For Summary Judgment, the motions for summary judgment of Defendant–Intervenors American President Lines, Ltd., Puerto Rico Maritime Shipping Authority, and Sea–Land Service, Inc.; Margate Shipping Company and Chestnut Shipping Company; Mormac Marine Transport, Inc.; and BP Oil Shipping Company, as well as the supporting and opposing memoranda of law and statements of material facts, the administrative record in this case, and the arguments presented in open court, and consistent with the Court's Opinion issued this same day, the Court finds that there are no genuine issues as to any material facts and that Defendants and Defendant–Intervenors are entitled to judgment as a matter of law. Accordingly, it is hereby

ORDERED that Plaintiffs' Motion For Summary Judgment is DENIED; it is

FURTHER ORDERED that Defendants' Motion For Summary Judgment is GRANTED; it is

FURTHER ORDERED that the Motion For Summary Judgment of Defendant–Intervenors American President Lines, Ltd., Puerto Rico Maritime Shipping Authority, and Sea–Land Service, Inc. is GRANTED; it is

FURTHER ORDERED that the Motion For Summary Judgment of Defendant–Intervenors Margate Shipping Company and Chestnut Shipping Company is GRANTED; it is

FURTHER ORDERED that the Motion For Summary Judgment of Defendant–Intervenor Mormac Marine Transport, Inc. is GRANTED; it is

FURTHER ORDERED that the Motion For Summary Judgment of Defendant–Intervenor BP Oil Shipping Company is GRANTED; and it is

FURTHER ORDERED that judgment is entered for Defendants and Defendant–Intervenors and the complaints are DISMISSED with prejudice.

SO ORDERED.