**OSG BULK SHIPS, INC., Appellant,**

v.

**UNITED STATES of America, et al., Appellees.**

No. 96–5156.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 3, 1997.

Decided Jan. 16, 1998.

Joseph A. Klausner, Washington, DC, argued the cause for appellant, with whom Allan A. Tuttle was on the briefs.

Cynthia A. Schnedar, Assistant U.S. Attorney, Washington, DC, argued the cause for the federal appellees, with whom Mary Lou Leary, U.S. Attorney, John D. Bates and R. Craig Lawrence, Assistant U.S. Attorneys, were on the brief. Michael J. Ryan, Assistant U.S. Attorney, entered an appearance.

Thomas L. Mills, Washington, DC, argued the cause for the private appellees, with whom Robert M. Rader, T.S.L. Perlman, Anne E. Mickey and John W. Butler were on the joint brief. Richard A. Hibey entered an appearance.

T.S.L. Perlman, Washington, DC, was on the brief for appellee Mormac Marine Transport, Inc.

Before: HENDERSON, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

The Maritime Administration has a long-standing interpretation of the Merchant Marine Act of 1936 under which any vessel built with the aid of a "construction-differential subsidy" from the federal government, and thus limited at least initially to service in foreign trade only, can enter domestic trade after the statutorily defined economic life of the vessel expires. OSG Bulk Ships, Inc. challenged that interpretation in the district court, which granted summary judgment to the defendant agency and several private defendant-intervenors after concluding that, especially in light of a Supreme Court decision that involved a closely related issue, the agency's interpretation was unobjectionable. We affirm.

I.

Because building ships and manning them in the United States was and remains more expensive than in other countries, Congress enacted the Merchant Marine Act of 1920 (commonly known as "the Jones Act") and the Merchant Marine Act of 1936 ("the 1936 Act") in an attempt to protect the American shipping industry against foreign competition. *See Independent U.S. Tanker Owners*

*Comm. v. Lewis,* 690 F.2d 908, 911–12 (D.C.Cir.1982). In these acts, Congress effectively divided the American commercial shipping fleet in two—one fleet for domestic trade and one for foreign—and took different steps to support each. In the Jones Act, Congress limited trade between domestic ports to ships built in American shipyards, owned by American citizens, and operated under the American flag. *See* 46 U.S.C. app. § 883 (1988). Foreign vessels cannot compete in this domestic market with the Jones Act fleet. *See id.*

American ships operating in trade between foreign and domestic ports do not enjoy the same protection from international competition, but in the 1936 Act, Congress instituted two types of government subsidies in an attempt to make these vessels competitive in the international market: the operating-differential subsidy ("ODS") and the construction-differential subsidy ("CDS"). *See id.* §§ 1151, 1171. Under the ODS program, the Secretary of Transportation ("the Secretary") can grant subsidies to American vessels in foreign trade to offset the higher operating costs these vessels generally face compared to their international competitors. *See id.* § 1171. Under the CDS program, the Secretary can enter into contracts to subsidize American shipyards' construction of new vessels to be operated under the American flag. *See id.* § 1154.

Because vessels built with the aid of the CDS program would have an unfair advantage if allowed to compete directly with the unsubsidized Jones Act ships in domestic trade, section 506 of the 1936 Act limits CDS-built vessels to operation "exclusively in foreign trade," with two exceptions. *Id.* § 1156.[1] First, CDS-built vessels can make certain domestic stops on bona fide foreign voyages. *See id.* Second, the Secretary may consent to allow CDS-built vessels to engage in domestic trade for temporary periods up to six months in any year. *See id.* In each case, however, the owner of a CDS-built vessel using one of these exceptions must repay to the government a portion of the CDS depending on the time spent in domestic trade compared to the vessel's economic life, which is established by statute as twenty years for tankers and twenty-five years for vessels carrying dry goods. *See id.*; Pub.L. No. 86-518, §§ 1, 3, 74 Stat. 216, 216 (1960); H.R.Rep. No. 86-1744, at 5–8 (1960), *reprinted in* 1960 U.S.C.C.A.N. 2383, 2386–87.

The meaning of section 506 cannot be understood without reference to *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980). In *Seatrain,* the Court addressed the legality of an action under the 1936 Act by the Maritime Administration ("MarAd"),[2] in which the

1. Section 506 provides:
 Every owner of a vessel for which a construction-differential subsidy has been paid shall agree that the vessel shall be operated exclusively in foreign trade, or on a round-the-world voyage, or on a round voyage from the west coast of the United States to a European port or ports which includes intercoastal ports of the United States, or a round voyage from the Atlantic coast of the United States to the Orient which includes intercoastal ports of the United States, or on a voyage in foreign trade on which the vessel may stop at the State of Hawaii, or an island possession or island territory of the United States, and that if the vessel is operated in the domestic trade on any of the above-enumerated services, he will pay annually to the Secretary of Transportation that proportion of one-twenty-fifth of the construction-differential subsidy paid for such vessel as the gross revenue derived from the domestic trade bears to the gross revenue derived from the entire voyages completed during the preceding year. The Secretary may consent in writing to the temporary transfer of such vessel to service

other than the service covered by such agreement for periods not exceeding six months in any year, whenever the Secretary may determine that such transfer is necessary or appropriate to carry out the purposes of this chapter. Such consent shall be conditioned upon the agreement by the owner to pay to the Secretary, upon such terms and conditions as he may prescribe, an amount which bears the same proportion to the construction-differential subsidy paid by the Secretary as such temporary period bears to the entire economic life of the vessel. No operating-differential subsidy shall be paid for the operation of such vessel for such temporary period.
46 U.S.C. app. § 1156.

2. MarAd is an agency within the Department of Transportation charged with oversight of the United States merchant marine, including "[a]warding and administering construction-differential subsidy contracts and operating-differential subsidy contracts to aid the American merchant marine." 49 C.F.R. § 1.4(j)(1)–(2) (1997).

agency allowed the owners of a CDS-built vessel to enter the domestic market upon repayment of the CDS to the government. *See id.* at 574, 100 S.Ct. at 802. In upholding this action, the Supreme Court ruled that the 1936 Act empowered the Secretary to approve full repayment/permanent release transactions of this type. *See id.* at 588–95, 100 S.Ct. at 809–13. Section 506, the Supreme Court noted, only limited when *temporary* exceptions to the foreign-trade-only requirement would be available; neither that section nor any other addressed when *permanent* releases would be permissible, and the legislative history did not show that Congress intended to preclude such permanent releases.[3] *See id.* at 588, 100 S.Ct. at 809. The discretion given to the Secretary to administer the 1936 Act, the Court concluded, was broad enough to allow him to permit the entry of the vessel into the domestic market. *See id.*

The policy upheld in *Seatrain* reflected MarAd's longstanding view that, under the 1936 Act, when the owner of a CDS-built vessel has repaid the government for the value of the subsidy—through monetary repayment, service in the foreign shipping market for the vessel's economic lifetime, or a combination of the two—there is no longer any need to restrict that vessel to service in foreign trade only. Correspondingly, MarAd has allowed CDS-built vessels to enter the domestic market in the middle of their economic lives upon repayment of a sum equal to the unamortized value of the CDS for the remaining portion of the ship's economic life. In addition, MarAd has long made known its position that the section 506 foreign-trade-only restriction would lapse, even without payment, at the end of CDS-built vessels' economic lives, because at that time the CDS debt to the government had been repaid in full through service in foreign trade. *Seatrain* did not invalidate these practices, nor has the agency retreated from its general interpretation of section 506 since that time.

## II.

OSG Bulk Ships, Inc. ("OSG") owns eleven non-CDS tankers carrying oil in domestic trade and leases two more. Many other companies built tankers with the aid of the CDS program between 1973 and 1984; the first of these reached the end of its economic lifetime on August 8, 1993, with thirty more scheduled to do so by the year 2004. On January 1, 1994, with MarAd's acquiescence, the Coronado became the first CDS-built tanker to enter the domestic market and begin to compete directly with OSG's unsubsidized tankers.

In July 1993, before the economic lifetime of any CDS-built vessel had expired, OSG sought to have the agency reconsider its interpretation of section 506. Approving the permanent release of CDS-built vessels whose economic lives had expired, OSG argued, would be inconsistent with the plain language of the statute and its underlying purposes. In response, several other companies urged the agency not to alter its interpretation. The agency concluded that its interpretation of the 1936 Act was sound, and reported its decision to reaffirm that interpretation in a series of letters dated March 31, 1994, and April 1, 1994.

On January 3, 1994, three months before MarAd sent these letters, OSG filed suit against the agency, challenging MarAd's interpretation of section 506 under which CDS-built vessels could enter the domestic market after their economic lives had passed. Two private companies thereafter intervened as plaintiffs[4] and nine as defendants.[5] The dis-

---

**3.** The Court noted in particular that permanent releases into domestic trade do not carry the same potential for making competition unfair as temporary releases do: while a CDS-built vessel unrestrained in its ability to take temporary jaunts into the Jones Act fleet's preserve would be "capable of taking advantage of every shift in trade and profitability, skimming the cream and leaving what remains to the less mobile," the permanent release of a CDS-built vessel "irrevocably locates the vessel in the unsubsidized fleet and thus poses no danger of a supercompetitor skimming the cream from each market." *Seatrain*, 444 U.S. at 588–89, 100 S.Ct. at 809–10.

**4.** Attransco, Inc. and Matson Navigation Co., Inc. were the intervening plaintiffs in the district court, but these companies are not parties to this appeal.

**5.** BP Oil Shipping Co., Chestnut Shipping Co., Margate Shipping Co., and Mormac Marine Transport, Inc. were defendant-intervenors be-

trict court concluded that there was no basis on which to overturn MarAd's interpretation. Applying the two-step analysis of *Chevron U.S.A. Inc. v. Natural Resources · Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the court noted that under *Seatrain* it was clear first that the statute did not answer the precise question and second that the Secretary had broad discretion to implement the statute; thus, MarAd clearly had discretion to interpret the 1936 Act with regard to permanent release of CDS-built vessels into the domestic market, and the interpretation it chose was a permissible one. *See OSG Bulk Ships, Inc. v. United States*, 921 F.Supp. 812, 818–27 (D.D.C.1996). On cross-motions for summary judgment, the court granted summary judgment for the defendants. *See id.* at 828.

### III.

While our review of the grant of summary judgment is *de novo, see Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994), we affirm substantially for the reasons set forth by the district court in its opinion. *See OSG Bulk Ships*, 921 F.Supp. at 812–28. We need only address a threshold jurisdictional issue and elaborate upon the response to OSG's economic arguments challenging the reasonableness of MarAd's interpretation.

 The jurisdictional issue arises as a result of appellee's contention that the district court did not even have jurisdiction to hear the case in the first place.[6] Appellees characterize OSG's complaint as a challenge to MarAd's decision not to enforce the section 506 ban on domestic trade by CDS-built vessels in certain instances. *Heckler v. Cha-*

*ney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), and *Crowley Caribbean Transport, Inc. v. Pena*, 37 F.3d 671 (D.C.Cir. 1994), establish that agencies' nonenforcement decisions are generally unreviewable under the Administrative Procedure Act ("APA"), *see Chaney*, 470 U.S. at 830–35, 105 S.Ct. at 1654–57; *Crowley Caribbean Transp.*, 37 F.3d at 674–75; however, an agency's adoption of a general enforcement policy is subject to review. Indeed, in *Crowley Caribbean Transport*, this court distinguished between "an agency's statement of a *general enforcement policy*" and a "*single-shot* nonenforcement decision," the former being reviewable even though the latter may not be. *Id.* at 676; *see also Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C.Cir. 1993); *National Wildlife Fed'n v. EPA*, 980 F.2d 765, 772–73 (D.C.Cir.1992). Because MarAd's action was not such a single-shot non-enforcement decision, the district court had jurisdiction to consider OSG's complaint, as we have jurisdiction to hear the appeal. *See* 28 U.S.C. §§ 1291, 1331 (1988).

 Turning to the merits, we adopt the analysis of the district court insofar as it considered whether in section 506 Congress had decided the issue, in which event the agency must adhere to the unambiguous expression of congressional intent, and if not, whether the agency's interpretation of the act is reasonable in light of the statutory policies and purposes. *See Chevron*, 467 U.S. at 842–45, 104 S.Ct. at 2781–82.[7] *Seatrain* establishes that nothing in the 1936 Act spoke directly about whether MarAd could release CDS-built vessels permanently from their obligations under section 506, and no legislative enactments since *Seatrain* em-

---

low and remain parties to this appeal. Puerto Rico Maritime Shipping Authority, Aquarius Marine Co., Atlas Marine Co., Sea–Land Service, Inc., and American President Lines, Ltd. were defendant-intervenors below but are no longer parties to this appeal.

6. Notably, only the private appellees press this argument; the agency itself does not.

7. OSG contends that review under the arbitrary-or-capricious standard of section 706(2)(A) of the APA, 5 U.S.C. § 706(2)(A) (1988), is appropriate instead of *Chevron*, but this is incorrect. True enough, when Congress has "explicitly left a gap

for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation" and ensuing regulations are reviewed pursuant to the arbitrary-or-capricious standard. *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–82. But when, as here, Congress has not explicitly delegated rulemaking authority to the agency charged with administering the statute, the *Chevron* analysis is the appropriate means by which to evaluate the agency's interpretation of the statute. *See id.* at 844, 104 S.Ct. at 2782. In any event, applying the arbitrary-or-capricious standard would not yield a different result.

body indications of congressional intent on the matter clear enough to provide an unambiguous answer.

In *Seatrain*, the Supreme Court upheld a policy under which the agency allowed a CDS-built vessel to enter the domestic market upon repayment of the CDS to the government. *See Seatrain*, 444 U.S. at 574, 100 S.Ct. at 802. In so doing, the Court noted that "[section] 506 simply mandates that vessels enjoying the benefits of a subsidy may move *in and out* of domestic commerce only under narrowly circumscribed conditions. It speaks to *temporary* releases from the foreign-trade-only requirement, and *only* to such releases." *Id.* at 588, 100 S.Ct. at 809. Nothing in the 1936 Act or its legislative history, the Court held, had direct bearing on the Secretary's ability to regulate permanent releases into the domestic market. *See id.* at 590, 100 S.Ct. at 810. Although the particular facts in the case involved CDS repayment before the end of a vessel's economic life, the analysis in *Seatrain* establishes, for purposes of the first step in our *Chevron* analysis, that at the time, Congress had not answered the precise question in this case: whether CDS-built vessels could be permanently released from the section 506 restrictions at the end of their economic lives.

■ OSG's contention that congressional enactments after *Seatrain* show that Congress meant to answer that question in the negative is meritless. In 1987, in section 505 of the Supplemental Appropriations Act, Pub.L. No. 100-71, 101 Stat. 391 (1987), Congress forbade MarAd from expending any funds "for the permanent release of vessels from the restrictions in section 506 of [the 1936 Act]." Supplemental Appropriations Act § 505.[8] Contrary to OSG's contention, nothing in this section precludes MarAd from interpreting the 1936 Act to allow the permanent release of CDS-built vessels into the domestic market. Mere appropriations acts, which on their surface only address funding matters, do not make changes in substantive law unless they do so explicitly. *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978); *National Treasury Employees Union v. Devine*, 733 F.2d 114, 117 n. 8 (D.C.Cir.1984). Neither this text nor its legislative history contains any expression of congressional intent clear enough to allow us to infer that this section had any substantive effect on the 1936 Act.[9]

Neither can OSG find support for its view that Congress intended to bar policies such as that adopted by MarAd in this case in the Maritime Security Act of 1996, Pub.L. No. 104-239, 110 Stat. 3133. In that act, Congress amended the 1936 Act to add a new section 512 providing that restrictions under section 506 do not apply to CDS-built *liner vessels* after "the expiration of the 25-year period beginning on the date of the original delivery of the vessel from the shipyard." 46 U.S.C.A. app. § 1162 (Supp.1997).[10] OSG

**8.** Section 505 provides:

None of the funds appropriated or made available by this or any other Act or otherwise appropriated or made available to the Secretary of Transportation or the Maritime Administrator for purposes of administering the Merchant Marine Act, 1936, as amended (46 U.S.C. 1101 et seq.), shall be used by the United States Department of Transportation or the United States Maritime Administration to propose, promulgate, or implement any rule or regulation, or, with regard to vessels which repaid subsidy pursuant to the rule promulgated by the Secretary May 3, 1985 and vacated by Order of the U.S. Court of Appeals for the D.C. Circuit January 16, 1987, conduct any adjudicatory or other regulatory proceeding, execute or perform any contract, or participate in any judicial action with respect to the repayment of construction differential subsidy for the permanent release of vessels from the re-

strictions in section 506 of the Merchant Marine Act, 1936, as amended: *Provided*, That such funds may be used to the extent such expenditure relates to a rule which conforms to statutory standards hereafter enacted by Congress.

Supplemental Appropriations Act § 505.

**9.** The legislative history behind this particular provision is quite sparse, but what there is implies that Congress was attempting to accommodate this court's decision in *Independent U.S. Tanker Owners Committee v. Dole*, 809 F.2d 847 (D.C.Cir.1987). *See* H.R.Rep. No. 100-28, at 120–21. The legislative history gives no indication that Congress meant to effect a substantive change in the 1936 Act.

**10.** As codified, section 512 provides:

Notwithstanding any other provision of law or contract, all restrictions and requirements un-

claims that the exclusion of CDS-built *tankers* from this new section was purposeful. Even if we were inclined to credit this textual argument, however, the legislative history does not support this characterization of section 512. Congress was if anything endorsing MarAd's general policy: it enacted section 512 to "reaffirm a longstanding executive branch interpretation of applicable statutes." H.R.REP. No. 104-229, at 15 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3521, 3528. This amendment to the 1936 Act does not show congressional intent to preclude MarAd's interpretation of section 506.

■ Absent congressional indication regarding whether the foreign-trade-only requirement of section 506 lapses for CDS-built vessels at the end of their economic lives, the only question is whether MarAd's interpretation of the 1936 Act in this regard was reasonable. *See Chevron*, 467 U.S. at 843-45, 104 S.Ct. at 2781-82. As the district court noted, in this second step, courts generally accord great deference to the particular way in which the agency chooses to implement a statute that it is empowered to administer. *See OSG Bulk Ships*, 921 F.Supp. at 821. "The court must defer to the agency's interpretation so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language." *Coal Employment Project v. Dole*, 889 F.2d 1127, 1131 (D.C.Cir.1989); *see also Rust v. Sullivan*, 500 U.S. 173, 184, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991). Given the Secretary's "broad authority to oversee administration of the [1936] Act," *Seatrain*, 444 U.S. at 585, 100 S.Ct. at 808, this court has stated that an interpretation of the 1936 Act

by MarAd "must be accepted 'unless it is manifestly unreasonable.'" *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 419 (D.C.Cir.1991) (quoting *National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 174 (D.C.Cir.1982)).

As *Seatrain* establishes, MarAd's interpretation does not conflict with the plain language of the statute. The 1936 Act does not directly address when the agency can grant CDS-built vessels permanent releases from the section's restrictions. *See Seatrain*, 444 U.S. at 588-90, 100 S.Ct. at 809-10. Furthermore, the Supreme Court concluded, "[o]n the face of the statute, the Secretary's broad contracting powers and discretion to administer the [1936] Act seem to comprehend the authority" to allow the permanent release of CDS-built vessels upon the repayment of their subsidies to the government. *Id.* at 588, 100 S.Ct. at 809. There is no basis in the statute upon which to conclude that this broad discretion would not allow MarAd to interpret the 1936 Act to allow permanent release upon expiration of CDS built vessels' economic lives as well as upon such repayment.

Hence, we need only elaborate on the district court's analysis by emphasizing, in response to OSG's economic arguments, that MarAd's interpretation accords well with the general purposes of the 1936 Act. In the act, Congress explicitly enumerated these purposes, the primary one being this: "It is declared to be the policy of the United States to foster the development and encourage the maintenance of ... a merchant marine." 46 U.S.C. app. § 1101 (1988);[11] *see also Liberty*

---

der sections 1153, 1156, and 1212 of this Appendix applicable to a liner vessel constructed, reconstructed, or reconditioned with the aid of construction-differential subsidy shall terminate upon the expiration of the 25-year period beginning on the date of the original delivery of the vessel from the shipyard.
46 U.S.C.A. app. § 1162.

11. Section 1101 provides:

It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the waterborne export and import

foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States, insofar as may be practicable, (d) composed of the best equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel, and (e) supplemented by efficient facilities for shipbuilding and ship repair. It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine.

*Maritime Corp.,* 928 F.2d at 419. The MarAd interpretation at issue in this case furthers this goal: if CDS-built vessels can enter the domestic trade after the expiration of their economic lives, it is more likely that there will be a fleet of American ships "sufficient to carry [the nation's] domestic waterborne commerce ... and to provide shipping service essential for maintaining the flow of ... domestic and foreign water-borne commerce at all times." 46 U.S.C. app. § 1101. This is particularly so given that, if CDS-built vessels whose economic lives have expired cannot enter the domestic trade, the alternative is likely the scrapyard: such vessels no longer receive operating-differential subsidy payments, *see id.* § 1175(b), and American vessels have difficulty competing in the international shipping market even with the benefit of the ODS program. As the Supreme Court concluded in *Seatrain,* "a permanent release from the foreign-trade-only requirement may quite directly further the general goals of the [1936] Act." *Seatrain,* 444 U.S. at 588, 100 S.Ct. at 809.

Undoubtedly, a further purpose of the 1936 Act and section 506 in particular is "to protect unsubsidized U.S. shipowners from the unfair competition of subsidized U.S. shipowners," *Liberty Maritime Corp.,* 928 F.2d at 413 (citing *Seatrain,* 444 U.S. at 586–87, 100 S.Ct. at 808–09), but we see no inconsistency between MarAd's interpretation of section 506 and this statutory end. In a July 1964 internal memorandum, MarAd concluded that the owner of a CDS-built vessel who has paid off the CDS either in cash or through service in foreign trade is, in effect, "in the same position as if he had paid the full domestic price; that is, he should not be required to make further repayments, and should not be bound to an exclusive foreign trade obligation." [12] Once the economic life of a CDS-built vessel has expired, in MarAd's

view, that vessel is no longer different in any relevant way from an unsubsidized vessel in the Jones Act fleet. Hence, MarAd has consistently avowed, there is no reason to "protect" that fleet from the competition from CDS-built vessels that have served their time in foreign trade.

This view of the competitive equities is reasonable: OSG has given no compelling reason why it is inherently unfair to admit a CDS-built vessel into the domestic market. Although allowing subsidized vessels to compete directly with unsubsidized vessels would be unfair if there were no offsetting factor to balance competitive conditions, the benefit of the subsidy is counterbalanced by the restriction of CDS-built vessels to the foreign market through their economic lives. [13] By contrast, the Jones Act fleet is free at all times to exploit economic opportunities in both domestic and foreign markets, and MarAd's conclusion that the competition between Jones Act vessels and CDS-built vessels whose economic lives have expired will not be unfair is reasonable. The mere fact that the CDS-built vessels once had a subsidy could not be significant or the Supreme Court would not have concluded in *Seatrain* that, "at least where repayment of the CDS includes some amount reflecting capital costs which would have been incurred had no subsidy been available, such a transaction merely permits a once subsidized vessel to enter the domestic trade on a footing equal to that of vessels already in that trade." *Seatrain,* 444 U.S. at 589–90, 100 S.Ct. at 810–11 (footnote omitted). [14] We see no significant difference between repayment for the CDS in money and repayment through service in the foreign trade; in neither case does the vessel formerly encumbered with a CDS possess an unfair competitive advantage over vessels never so encumbered. Indeed, if anything, allowing CDS-built vessels to enter the do-

---

46 U.S.C. app. § 1101. The Jones Act contains a similar statement of congressional purpose. *See* 46 U.S.C. app. § 861 (1988).

**12.** Memorandum from Graydon L. Andrews, Acting General Counsel, Maritime Administration, to Maritime Subsidy Board, Maritime Administration 5 (July 28, 1964).

**13.** Of course, these vessels can enter the domestic market under the limited exceptions in sec-

tion 506, but only upon proportional repayment of their CDS. *See* 46 U.S.C. app. § 1156.

**14.** This reasoning was presaged by Judge Bazelon's dissent in the decision of this court reversed by the *Seatrain* Court. *See Alaska Bulk Carriers, Inc. v. Kreps,* 595 F.2d 814, 843 (Bazelon, J., dissenting) (D.C.Cir.1979).

mestic trade after the expiration of their economic lives is *more* fair than the practice upheld by the Supreme Court in *Seatrain:* allowing the permanent release of CDS-built vessels from the section 506 restrictions before the natural expiration of their economic lives means that Jones Act vessels are less able to prepare for the entry of new competitors in the domestic market.

OSG contends also that the interpretation does not further certain other goals of the 1936 Act, such as the goals of ensuring that the merchant marine remain modern and, concomitantly, stimulating the domestic shipbuilding industry. *See* 46 U.S.C. app. §§ 1101, 1157, 1158, 1160 (1988). OSG claims that MarAd's interpretation conflicts with these statutory purposes in that it does not take old ships out of service at the end of their economic lives, but actually encourages them to remain active. Again, however, MarAd's interpretation of section 506 does not act counter to these goals because CDS-built vessels whose economic lives have expired are, for all relevant purposes, identical to those built without subsidization. No one would suggest that MarAd should forcibly retire all vessels after they reach a certain age, although doing so would ensure a modern fleet and stimulate domestic shipbuilding. The way the agency meets these goals is a matter to which it is entitled to some discretion. Indeed, given the proper level of deference we owe to MarAd, the agency's interpretation need not further *every* statutory purpose in the 1936 Act. MarAd's approach furthers the overall purposes of the statute, and OSG has presented no reason to disturb the agency's judgment about how best to weigh the individual purposes to effectuate Congress's overall goals. *See Continental Air Lines, Inc. v. Department of Transp.*, 843 F.2d 1444, 1450–52 (D.C.Cir.1988).[15]

Finally, we conclude as well that MarAd's explanation of why its interpretation of the 1936 Act was consistent with the statutory purposes, though cursory, was sufficient. *Cf. id.* at 1451–53. OSG insists that MarAd's pronouncements of the interpretation at issue in this case were cursory and circular and inadequately addressed the policies and purposes of the 1936 Act. To the contrary, as the district court concluded, "[t]he agency has considered and explained its interpretation of Section 506 in a detailed and reasoned fashion consistent with the statutory purpose." *OSG Bulk Ships*, 921 F.Supp. at 826. MarAd has explained that the CDS-built vessel that has paid off its CDS either in cash or through service in foreign trade for its economic lifetime is, in effect, in the same position competitively as the non-CDS vessel that was free to engage in domestic trade all the while. Even though the agency may not have explicitly mentioned and weighed every statutory purpose in making this conclusion, its views with regard to those purposes are inherent in the explanation; for instance, there was no further need to address the economic fairness of this interpretation of section 506, given the view that, after the expiration of their economic lifetimes, CDS-built vessels would essentially be in the same competitive position as Jones Act vessels. On these particular facts, though we would certainly find a lengthier explanation helpful, we cannot say that MarAd's explanation was insufficient.

Given the instruction of *Seatrain* and the absence of later congressional directive, MarAd's discretion to award permanent releases to the section 506 foreign-trade-only restriction is extremely broad: as long as the agency does not allow CDS-built vessels to take

---

**15.** In an unpersuasive alternative argument, OSG insists that MarAd could not adopt a general policy, but instead should have to weigh, upon every application of a CDS-built vessel to enter the domestic fleet, whether such entry would be consistent with the purposes and policies of the 1936 Act. This argument is evidently (and mistakenly) based on the declaration in *Seatrain* that the Secretary had broad discretion whether to allow the particular permanent release in question in that case. *See Seatrain*, 444 U.S. at 597,

100 S.Ct. at 814. The Court did not, however, say that the Secretary would have to consider the appropriateness of each such permanent release on a case-by-case basis. It would be a perverse result indeed if the Supreme Court's deliberate affirmation of the breadth of the agency's discretion in such matters actually *precluded* the agency from adopting a general rule in this case. *Cf. Independent U.S. Tanker Owners Committee*, 809 F.2d at 850–51.

the subsidy without paying for the benefit with some currency of value under the 1936 Act—either money or service in the foreign shipping market—the agency will likely be acting within its discretion. The interpretation of the 1936 Act at issue in this case is well within the realm of permissible interpretations. Accordingly, we affirm the grant of summary judgment.