**NATIONAL WILDLIFE FEDERATION, et al., Plaintiffs,**

v.

**Dr. Joseph WESTPHAL, et al., Defendants.**

**No. Civ.A. 98–2700(EGS).**

United States District Court, District of Columbia.

June 27, 2000.

James M. Hecker, Trial Lawyers for Public Justice, Washington, DC, for Plaintiffs.

Aimee S. Bevan, Daniel G. Steele, U.S. Dept. of Justice, Environmental & Natural Resources Div., General Litigation Section, Washington, DC, James E. Merritt, Jr., General Attorney, U.S. Army Engineer, Dist., Vicksburg, MS, J. Michael Klise, R. Timothy McCrum, Ellen B. Steen, Crowell & Moring, Washington, DC, Charles S. Tindall, III, Greenville, MS, for Defendants.

### MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

The National Wildlife Federation and individual plaintiffs challenge the decision of the Army Corps of Engineers ("Corps") approving the Big Sunflower River Maintenance Project ("the project") in northwestern Mississippi. In Count I, plaintiffs allege that the Corps' decision violates the Water Resources Development Acts ("WRDA") of 1986 and 1996, 33 U.S.C. § 2201 *et seq.* because the Corps has failed to require that the Levee Districts, as the local sponsors of the project, share in the cost of the project as required under WRDA. As part of this claim, plaintiffs also allege that the Corps lacks congressional authorization for the project. Count II was dismissed by the plaintiffs with prejudice. In Count III, plaintiffs allege that the Corps violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* and 40 CFR § 1502.2(d) by failing to include in the Supplemental Environmental Impact Statement (SEIS) any analysis or mention of how the project will or will not achieve the requirements of WRDA. In Count IV, plaintiffs allege that the Corps violated NEPA by failing to analyze non-structural alternatives such as flowage easements in the final SEIS.

For the following reasons, plaintiffs' motion for summary judgment is **DENIED**

and defendants' motion for summary judgment is **GRANTED.**

## I. Background

The Big Sunflower River Project was originally authorized by the Flood Control Act of 1944. *See* Pub.L. No. 78–534, 58 Stat 895 (*hereinafter* Flood Control Act of 1944). The Secretary of the Army, through the Corps, has the primary authority for construction and maintenance of federal flood control and navigation projects in the Mississippi River Basin. *See* 33 U.S.C. § 702, *et seq.*

The original project was designed to reduce headwater flooding in the Big Sunflower River Basin by improving main streams so as to provide better outlets for the drainage systems. *See* Flood Control Act of 1944, at ¶ 46. This goal has been accomplished by providing a specified channel capacity in accordance with the Cypress Creek formula. *See id.*, at ¶ 31, Appendix, at ¶ 3; *see also* Admin.R., Tab 2, at M–3 – M–4; Tab 5, at 5; Tab 6, at 7. Congress anticipated that maintenance would be necessary to maintain the specified channel capacity. *See* Flood Control Act of 1944, at ¶ 66 (recommending that local interests maintain the improvements after completion). To achieve this level of flood protection, the Flood Control Act of 1944 authorized "83 miles of snagging, 115 miles of clearing and snagging, and 14 miles of channel enlargement." *Id.* at ¶ 50. The project was subsequently extended by the Flood Control Acts of 1946 and 1950, which authorized improving drainage on 666.6 miles of streams and shortening streams by 20.7 miles through cut-offs and realignments. *See* Admin.R., Tab 5, at a.

The original authorization recommended that local interests maintain the improvements after construction. *See* Flood Control Act of 1944, at ¶ 66. The Flood Control Act of 1950, however, modified the maintenance responsibilities of local interests. *See* Pub.L. No. 81–516, codified at

33 U.S.C. § 702(c); Flood Control Act of 1928, page 2, § 3. The Corps has consistently interpreted this Act to require the local sponsors to be responsible for minor maintenance and for the Corps to be responsible for major maintenance of the project. *See* Admin.R., Tab 9, Digest of Water Resources Policies and Authorities, EP 1165–2–1, § 10–2c (June 30, 1983). Confirming this understanding, Congress has consistently appropriated Corps-requested funding for maintenance of the project. *See* Defs.' Ex. in Supp. of its Reply Mem. of P. & A. in Supp. of its Cross–Mot. for Summ.J. & in Opp'n to Pls.' Mot. for Summ.J., Exhibit A (collecting reports and appropriations from 1985–2000).[1] As a result, although construction on the project was completed in the 1960's, the project has never been turned over to a local sponsor. Rather, the Corps has continuing authority to maintain the project according to the specified level of flood protection.

Between 1989 and 1991, the Big Sunflower River Basin experienced extensive flooding. In 1989, approximately 450,000 acres flooded. In 1990, approximately 425,000 acres flooded. In 1991, approximately 700,000 acres flooded. As a result of the flooding in 1989–91, local land owners and flood control organizations raised concerns that the existing project was no longer functioning as intended, and requested that the Corps investigate the situation. Surveys and engineering data indicated that the lower reaches of streams in the project area had experienced significant loss of design capacity due to the growth of vegetation and sediment accumulation. In particular, the current capacity was estimated to be one to three feet above the 1962 design flow line, resulting in 185,000 acres losing the congressionally-prescribed level of flood protection. To restore the project to the specified level of flood protection, the Corps proposed the channel maintenance project at issue here.

1. While this exhibit is not part of the Administrative Record in this case, it is a compilation of relevant portions of congressional reports and appropriations from 1985 to 2000 and may properly be cited by the Court. *See Esch v. Yeutter*, 876 F.2d.976, 991 (D.C.Cir.1989).

In compliance with NEPA, the Corps issued the draft SEIS in March 1996 analyzing the project, and issued the final project report and SEIS on the project in June 1996. In the final project report, the Corps proposed performing "channel maintenance . . . on approximately 133.1 miles of streams. This includes the removal of approximately 8.42 million cubic yards (MCYs) of material along 104.8 miles of channel and clearing and snagging on 28.3 miles of channel." Admin.R., Tab 15, at i. The Corps estimated the fully funded cost of the project to be $62,485,-000. See id. On March 31, 1997, the Corps issued the Record of Decision ("ROD") on the project. See Admin.R., Tab 18. The ROD provides that the Corps will perform 104.8 miles of channel clean out[2] and 28.3 miles of channel clearing in the lower portion of the Sunflower Basin to restore the authorized design carrying capacity. See id. The project is designed to protect against floods with a two- to three-year frequency by reducing flood heights by two to three feet. See Admin.R., Tab 15, at 9. The project life for the proposed maintenance project is 25 years. Thereafter, flood conditions are predicted to return to pre-maintenance levels due to channel aggradation.

Among the alternatives the Corps initially considered was a non-structural option—the purchase of flowage easements. After a preliminary evaluation the Corps dismissed this as an unreasonable alternative on the following grounds:

2.2 Nonstructural Alternative

A nonstructural alternative was evaluated for comparative purposes consisting of acquiring perpetual flowage easements on land currently being impacted by flooding in the Big Sunflower River Basin. The purpose of this approach is to purchase the easement in lieu of maintenance and allow the land to continue to flood.

Hydrology studies revealed flood damages currently occurring up to the 25-year frequency flood event. The damaged acreage was categorized by crop type and flooding frequency. Real estate values were determined on the basis of these data. The more frequent the flooding, the higher the easement cost. Forested acres were not considered for acquisition since flooding impacts are considered relatively minor. A total of 185,000 acres of cleared agricultural land would require acquisition of a perpetual flowage easement at a cost of approximately $121 million, not including real estate acquisition costs, Public Law 91–646 costs, or costs to acquire any improvements that would be damaged by the flooding. This cost is more than twice as expensive as performing the proposed maintenance and therefore is not cost effective.

Under the perpetual flowage easements scenario, over time the channels would continue to aggrade, the flow lines would continue to rise, and more acreage would become subject to flooding. Additional easements would have to be acquired and further costs incurred for lands previously encumbered in light of flooding at one frequency, but successively flooding more often. In addition to the cost being prohibitive, the Corps does not currently have the authority to implement such measures. Although acquisition of perpetual easements would be from willing sellers only, this approach would also not likely be acceptable to local interests. Due to these reasons, this alternative was dropped from further consideration.

Admin.R., Tab 15, at 2–1.

## II. Discussion

A. *Whether Plaintiffs Have Standing to Bring their WRDA Claim*

WRDA provides that the Federal government will share the costs of flood con-

---

**2.** Channel cleanout is the removal of material from the bed of the channel to increase capacity. As such, it falls within the definition of dredging. A hydraulic dredge, dragline, or other equipment may be used to accomplish channel cleanout.

trol projects with local interests where physical construction is begun on a project after April 30, 1986. *See* 33 U.S.C. § 2213(a), (e). In approving the project here, the Corps did not require the local interests to share in the cost of the project because the Corps determined that WRDA did not apply to the project here. Defendants argue that plaintiffs lack standing to bring this WRDA claim.

Plaintiffs contend that the Corps made a legal error when it failed to require the local sponsors to share the costs of the projects based upon the Corps' determination that the WRDA did not apply to the project. Plaintiffs argue that if cost sharing is required, there is a "substantial likelihood" that the project will be dropped, or that it will proceed on a reduced scale. Plaintiffs requested and received limited discovery on the standing issue to try to establish that if the project is not 100% federally funded, the project will not go forward, or will go forward on a reduced scale. Following discovery, plaintiffs indicated that they did not wish to supplement their pleadings.

### 1. Legal Standard

 Standing requirements encompass both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise. *See Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citation and quotation marks omitted). To satisfy the Article III "case or controversy" requirement, a plaintiff must demonstrate: (1) that she has suffered an "injury in fact"; (2) that the injury is "fairly traceable" to the defendant's actions; and (3) that a favorable judicial ruling will "likely" redress the plaintiff's injury. *Id.; see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

 The Supreme Court has recognized prudential requirements for standing, including "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee in-

voked in the suit." *Bennett,* 117 S.Ct. at 1161; *see also Animal Legal Defense Fund, Inc. v. Glickman,* 154 F.3d 426, 431 (D.C.Cir.1998).

The zone of interests test is generous and relatively undemanding. *See Animal Legal Defense Fund,* 154 F.3d at 444. "[T]here need be no indication of congressional purpose to benefit the would-be plaintiff." *National Credit Union Admin. v. First Nat. Bank & Trust Co.,* 522 U.S. 479, 491, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). Instead, the test, a gloss on the Administrative Procedure Act § 10(a), 5 U.S.C. § 702 (1994) requires only that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected by the statute." *National Credit Union Admin.,* 522 U.S. at 492, 118 S.Ct. 927. The D.C. Circuit has further explained that "[t]his analysis focuses, not on those whom Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute protects." *Animal Legal Defense Fund,* 154 F.3d at 444. Ascertaining "[w]hether a plaintiff's interest is 'arguably ... protected ... by the statute' within the purview of the zone-of-interests test is determined not by reference to the overall purpose of the Act in question ... but by reference to the particular provision of law upon which the plaintiff relies." *Bennett,* 520 U.S. at 175–176, 117 S.Ct. 1154.

### 2. Analysis

Defendants argue that plaintiffs have failed to fulfill any of the elements of either constitutional or prudential standing.

#### a. Injury

As to the injury requirement, plaintiffs argue that their injury is that if the project goes forward, its members will suffer direct environmental and aesthetic harm. Plaintiffs contend that if cost sharing were required, either the project would not go forward, or it would go forward on a reduced scale. Defendants respond that

plaintiffs have failed to show that their injury is attributable to the failure to require cost sharing.

### b. Causation

As to causation or traceability, plaintiffs state that "the challenged conduct is the Corps' approval of the new Project in its March 1997 Record of Decision." Pls.' Reply Mem. of P. & A. in Support of its Mot. for Summ.J. and a Declaratory J. and in Opp'n to Defs.' Cross–Mot. for Summ.J., at 4. Defendants respond that plaintiffs' alleged injury is attributable to Congress' approval of the project to a specified design capacity, not to the absence of cost sharing.

### c. Redressability

As to redressability, plaintiffs present two arguments. First, plaintiffs argue that if cost sharing is required, it is likely that the project will not go forward or will go forward on a reduced scale. Second, plaintiffs argue that since the Corps lacks statutory authorization for the project, a ruling in their favor will eliminate the project. Defendants respond that this argument glosses over plaintiffs' inability to have identified an injury attributable to the failure to require cost sharing.

### d. Prudential Considerations

As to prudential considerations, defendants argue that plaintiffs' allegation of future injury is not within the zone of interests to be protected by the cost-sharing provisions of WRDA because there is no statutory language, nor legislative history to support the proposition that there are any environmental motivations for the provision. Plaintiffs respond that the legislative history and other WRDA provisions indicate that Congress had environmental motivations in enacting WRDA.

■ Plaintiffs have failed to show that they will suffer an injury that is fairly traceable to the defendant's failure to require cost sharing and that a favorable ruling by this Court will likely redress the plaintiffs' injury. *See Bennett*, 520 U.S. at 162, 117 S.Ct. 1154. As the plaintiffs stated, "the challenged conduct is the Corps' approval of the new Project in its March 1997 Record of Decision." This action— the approval of the project in the ROD—is the cause of the plaintiffs' alleged injury, not the Corps' failure to require cost sharing under WRDA. Although plaintiffs contend that the project would not have been approved, or would have been approved on a reduced scale, if cost sharing had been required, this is far too attenuated a connection to establish standing.

Moreover, plaintiffs have failed to satisfy the prudential requirement that they fall within the zone of interests to be protected by the cost-sharing provision of the statute. *See Bennett*, 520 U.S. at 162, 117 S.Ct. 1154. *Bennett* makes clear that in determining whether plaintiffs' interest is protected by the statute, the Court looks only at the statutory provision at issue— here the cost sharing provision. Plaintiffs, however, rely on statements in the legislative history and in other provisions of the statute to make this argument. Under *Bennett*, this analysis is clearly inappropriate.

### B. *Applicability of Water Resources Development Acts*

■ Assuming arguendo that plaintiffs have standing to raise this claim, WRDA clearly does not apply to this project because it is a maintenance project, not a new construction project. With some exceptions not relevant here, WRDA "applies to any project ... or separable element thereof, on which *physical construction* is initiated after April 30, 1986." 33 U.S.C. § 2213(e)(1) (emphasis added). WRDA does not define the word "construction." Though plaintiffs agree that the original project was fully constructed in the mid 1960's, plaintiffs claim that the Corps has improperly characterized the project as maintenance. Plaintiffs argue that rather than maintenance, the project is really new construction and so WRDA applies.

C. *Whether the Corps Lacks Congressional Authorization for the Project*

Plaintiffs argue that the Corps lacks congressional authorization for this project, which, according to plaintiffs, is not a maintenance project. Rather, they argue, it is a new construction project, and as such it must be authorized by Congress. Plaintiffs argue that this is a new construction project for three reasons: it is a material change to the original plan of improvement, it is a modification to the original project, and the project cannot.reasonably be characterized as a major maintenance.

While admitting that the Corps has no regulations defining what constitutes maintenance rather than construction for a channel improvement project, defendants argue that from the beginning of its work on the project, the Corps has characterized the project as a maintenance project to restore the project to its specified level of flood protection. Further, according to defendants, in 1993, 1994, and 1995 appropriations, Congress authorized maintenance funds for completing the SEIS at issue here, and for maintenance of the project. *See* Federal Defendants' Response to August 25, 1999 Order.

1. Is the project a material change to the original project?

Relying on *Environmental Defense Fund, Inc. v. Alexander,* 467 F.Supp. 885, 908–09 (D.Miss.1979) and Corps Pamphlet No. EP 1165–21, plaintiffs argue that since the project constitutes a material change to the original plan of improvement rather than maintenance of the original plan, the Corps must seek congressional authorization. Defendants respond that *Environmental Defense Fund v. Alexander* is distinguishable because that case concerns the Corps' authority to modify a project that Congress has authorized prior to construction. Since here, by contrast, both sides agree that the project is fully constructed, the Court is persuaded that *Environmental Defense Fund v. Alexander* does not require the Corps to obtain congressional approval for maintenance of an already-constructed project. As to the

Corps Pamphlet cited by plaintiffs, defendants respond that this regulation governs a situation in which the Corps' plan for the initial construction of a project differs from the plan authorized by Congress:

A proposed modification of an authorized project is brought to the attention of Congress if study after authorization shows that: ... the plan of improvement will be materially changed from that originally authorized by Congress.

Corps Pamphlet No. EP 1165–21, at 9–2. Again, because this project has already been constructed, the Court is of the opinion that the regulation cited by plaintiffs is inapplicable.

Plaintiffs further contend that the project is a material change to the original project because the instant project is mostly "channel cleanout" whereas the original project was "clearing and snagging." Defendants admit that to return the project to the specified level of flood protection, work will be performed in areas that did not previously require work and furthermore, different improvement techniques are being used. Defendants maintain that under *Story v. Marsh,* 732 F.2d 1375 (8th Cir.1984), the Corps' determination, after extensive study, that channel cleanout on previously untouched areas is necessary to return the project to the specified level of flood protection is entitled to a high degree of deference. The Court agrees that the Corps' decision as to how to return the project to the specified level of flood protection following extensive study, is entitled to considerable deference. *See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

2. Is the project an unauthorized modification to the completed 1944 project?

Plaintiffs argue that the Corps' own regulations demonstrate that the new project is an unauthorized modification to the 1944 project because under Corps policy, unless

there was a design or construction deficiency:

> The general rule is that Federal construction and funding authorities cease once a project is transferred to local interests for operation and maintenance. Thus in most cases additional Congressional authorization is required for any proposed Federal work associated with completed local protection projects.

Corps Engineer Regulation No. 1165–2–119, at 3. Defendant responds that this policy is inapplicable to the project here principally because it applies to multiple purpose projects, and the project here is not a multiple purpose project.

The Court agrees that the instant project is not an unauthorized modification to the original project under Corps' policy. In addition to the reason given by defendants, this project has never been turned over to local interests. Furthermore, pursuant to the Corps' continuing authorization to maintain the specified level of flood protection, the Corps approved this project to do just that. *See* Admin.R., Tab 15, at i; Admin.R., Tab 18. The administrative record in this case clearly indicates that the project is not a change to the original project authorized by Congress.

### 3. Is the project appropriately considered maintenance?

Plaintiffs argue that the instant project cannot reasonably be considered maintenance because it extends the useful life of the original project beyond the 40 years anticipated in 1944. *See* Flood Control Act of 1944, Appendix, at ¶ 18 & Table A–6 n. 2. Defendants respond that the 40–year project life mentioned in the 1944 Act is a planning number used for economic analysis of the costs and benefits of the project rather than an indication of the useful life of the project. Assuming arguendo that in 1944, Congress anticipated the useful life of the project to be 40 years, plaintiffs have cited no authority to support the proposition that later Congresses are prevented from continuing to appropriate funds for the maintenance of the project to extend its useful life, or indeed that this Court should, in essence, rule that Congress cannot appropriate any funds that would have the effect of extending the useful life of the project.

Relying on *OSG Bulk Ships, Inc. v. United States,* 132 F.3d 808 (D.C.Cir.1998), plaintiffs argue that this Court may not use the fact of congressional appropriations to imply that Congress is extending the useful life of the project. In *OSG Bulk Ships* this circuit stated, "Mere appropriations acts, which on their surface only address funding matters, do not make changes in substantive law unless they do so explicitly.... Neither this text nor its legislative history contains any expression of congressional intent clear enough to allow us to infer that this section had any substantive effect on the [ ] Act." *Id.* at 813. While it is true that Congress has not yet appropriated funds for this project in the appropriations for FY 2000, the report accompanying the 1993 appropriations bill explicitly authorized funding of the SEIS. *See* Energy and Water Development Appropriations Bill, 1993, H.R.Rep. No. 102–555, at 31 (1992) ("The Committee has provided an additional $2,000,000 for maintenance of the Big Sunflower unit of the Yazoo Basin project to be used to continue design and work on a Supplemental Environmental Impact Statement for the proposed channel cleanouts of the lower reaches of the Big Sunflower River, the Little Sunflower River, and the lower 25 miles of Bogue Phalia."). Furthermore, the reports accompanying the 1994 and 1995 appropriations bills contain line-item appropriations for maintenance of this project. *See* Energy ·and Water Developments Appropriation Bill, 1994, H.R.Rep. No. 103–147, at 43–44 (1993) ($1,162,000 recommended for maintenance, as opposed to construction, of the Big Sunflower River); Energy and Water Development Appropriation Bill, 1995, H.R.Rep. No. 103–291, at 39–40 (1994) ($1,921,000 recommended for maintenance, as opposed to construction, of the Big Sunflower River).

Plaintiffs next argue that the project cannot reasonably be considered a maintenance project because it requires the acquisition of additional land. The Court is persuaded by defendants' response that while the project may require the acquisition of land for disposal of dredged material, plaintiffs have failed to explain on what basis the necessity of additional land converts the project into a new construction project.

Further, plaintiffs argue that the magnitude of the work involved in the project is inconsistent with the Corps' own definition of maintenance. Defendants respond that plaintiffs have not cited regulations that define "maintenance" in the context of a channel improvement project. In the Court's view, the Corps' definition of what type of work constitutes maintenance in the context of a channel improvement project is entitled to considerable deference. This Court will not substitute its own definition of maintenance. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Finally, plaintiffs argue that maintenance is supposed to be in the hands of the local sponsors. However, it is uncontroverted that since the passage of the Flood Control Act of 1950, the Corps has consistently interpreted the Act to require the local sponsors to be responsible for minor maintenance and for the Corps to be responsible for major maintenance of the project. *See* Admin.R., Tab 9, Digest of Water Resources Policies and Authorities, EP 1165–2–1, ¶ 10–2 c (June 30, 1983).

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "arbitrary and capricious" standard of review is a highly deferential one, *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 282 (D.C.Cir.1981); *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.1976) (en banc), and presumes the agency's action to be

valid. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Moreover, the "arbitrary and capricious" standard is a narrow one, which forbids a court from substituting its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 416, 91 S.Ct. 814; *Ethyl Corp. v. EPA,* 541 F.2d at 34. When, as here, an agency has made a determination that falls within its area of special expertise, deference is at its zenith. *See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *Story v. Marsh,* 732 F.2d 1375, 1381 (8th Cir.1984).

From the commencement of its work on this project, the Corps has considered this a maintenance project rather than a new construction project. The Corps has deemed this project necessary to restore the specified level of flood protection to the project area. Despite plaintiffs' collateral attacks on the Corps' decision, plaintiffs have provided this Court with no reason not to defer to the Corps' determination from the beginning of this project that this is a maintenance project to restore the specified level of flood protection. As this determination by the Corps is one involving a technical area of expertise, it will be accorded a high degree of deference by this Court. *See Baltimore Gas & Elec. Co.* 462 U.S. at 103, 103 S.Ct. 2246.

D. *National Environmental Policy Act Claims*

1. Whether the Corps Violated NEPA because it Failed to Analyze the Requirements of WRDA in the SEIS

Plaintiffs argue that the defendants violated NEPA by not listing WRDA in the list of statutes with which the Corps complied in issuing the EIS and SEIS. According to plaintiffs, the Corps failed to comply with WRDA's cost-sharing provision. *See* 33 U.S.C. § 2213(a). Since the Court has determined that WRDA does not apply to this project, plaintiff's argument fails.

Furthermore, the case upon which plaintiffs relied, *Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir.1983), clearly does not stand for the proposition that NEPA requires the Corps to consider the requirements of WRDA.

### 2. Whether the Corps Violated NEPA Because it Failed to Analyze Nonstructural Alternatives in the SEIS

■ The Corps eliminated the nonstructural alternative—flowage easements—after a preliminary screening. The Corps gave the following reasons for eliminating this alternative: the acquisition of the easements would be cost-prohibitive; they would be contrary to the authorized purpose of the project; the Corps lacked statutory authorization to purchase easements rather than provide the designated level of flood protection; and local interests would not support this option. *See* Admin R., Tab 15, at 2–1. As a result, the nonstructural alternative was not subject to a comparative impact analysis in the Final Project Report. See Admin.R., Tab 15, at Table 2–2, 2–9 – 2–11 (summary of comparative impacts of alternatives).

Plaintiffs argue that the Corps' rationale for preliminarily dismissing the flowage easements option was flawed for two reasons. First, the Corps should not have compared the cost of one dredging with the cost of the purchase of easements because the dredging will have to be repeated in 25 years, whereas the easements need to be purchased only once. Second, the Corps overstated the easement costs because it compared the cost of purchasing easements to protect 185,000 acres subject to the 25 year flood event with the cost of the project, which will protect an average of 56,000 acres against a two-year flood.

Defendants respond that flowage easements are not a one-time cost because without maintenance the river will continue to fill with sediment, and as a result more land will flood and more easements will need to be purchased. As to the second purported flaw, defendants respond that while plaintiffs are correct that the project will protect an average of 56,000 acres against the two-year flood, the same 56,000 acres are not protected every year. Rather, the average annual number of acres flooded is a statistical representation of the potential for flooding in any year. Therefore, according to defendants, plaintiffs have improperly characterized the cost comparison. Furthermore, according to defendants, the Corps adjusted the price of the easements depending upon how frequently the land was flooded.

A court may set aside agency action if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). NEPA, the "basic national charter for protection of the environment," 40 C.F.R. § 1500.1, requires that whenever a federal agency undertakes "major federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(c), it must comply with the procedures set out in the regulations enacted to effect the purposes of NEPA. These procedures require agencies to take a "hard look" at environmental consequences, but, "NEPA itself does not mandate particular [substantive environmental] results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). "The NEPA process involves an almost endless series of judgment calls .... [the role of the courts in reviewing the judgment calls made by the agency] is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Coalition of Sensible Transportation v. Dole*, 826 F.2d at 66 (internal quotations omitted). When faced with a factual dispute regarding whether an agency's decision was arbitrary and capricious, the court's "inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotations omitted). NEPA requires

the agency to "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a).

The Court cannot conclude that the Corps' decision to dismiss preliminarily the flowage easement alternative as unreasonable was arbitrary and capricious. First, the Corps' decision to compare the cost of the maintenance project with the cost of the purchase of easements was not flawed because, contrary to plaintiffs' assertion, the purchase of easements is not a one-time purchase. Rather, to maintain the project to the specified level of flood protection, additional easements would need to be purchased over time. Plaintiffs' argument that the purchase of more easements in the future is speculative because the Corps has not indicated the size or cost of additional easements is unavailing.

Second, the Corps did not compare inconsistent acreage amounts and flood levels when it compared the costs of purchasing 185,000 acres protected against a 25 year flood with the costs of the project. The Corps adjusted the price of easements depending upon the frequency that the land was flooded. *See* Admin.R., Tab 15, at 2–3. Also, the Corps' comparison was not between protecting 185,000 acres and 56,000 acres, as plaintiffs contend. Rather, the 56,000 acre amount represents a prediction of the potential for flooding in any given year. *See* Admin.R., Tab 15, at 122.

### III. Conclusion

Accordingly, in view of the foregoing, it is hereby

**ORDERED** that defendants' unopposed motion to supplement the administrative record is **GRANTED,** and it is

**FURTHER ORDERED** that plaintiffs' motion for summary judgment [3–1, 3–2] is **DENIED;** and it is

**FURTHER ORDERED** that defendants' motion for summary judgment [27–1] is **GRANTED;** and it is

**FURTHER ORDERED** that the Clerk of the Court shall enter final judgment in favor of the defendants and against the plaintiffs.